[No. 12361-8-III.   Division Three.   March 1, 1994.]

*In the Matter of the Marriage of* ROBERT CARNEY
LUCKEY, *Respondent, and* PATRICIA KAY LUCKEY,
*Appellant.*

*Carl Maxey* and *Maxey Law Offices P.S.*, for appellant.

*P. Craig Walker, Sharon M. Brown,* and *Cowan, Walker, Jonson, Moore, Nickola & Heye,* for respondent.

SCHULTHEIS, J. — Patricia Luckey appeals the amended decree dissolving her 14-year marriage to Robert Luckey, M.D., contending: (1) the court erred in ruling that Dr. Luckey's medical practice had no goodwill; (2) the court abused its discretion in awarding Dr. Luckey unsupervised visitation with their 11-year-old son; (3) the court abused its discretion by refusing to award Ms. Luckey spousal maintenance beyond the first year of separation; and (4) she is entitled to an award of attorney fees and costs on appeal. We affirm.

Robert and Patricia Luckey were married in November 1973. After 14 years of marriage, they separated in June 1987; Dr. Luckey filed for dissolution that month. In April 1991, a decree was entered dissolving the marriage and reserving the issues of property division, child support and visitation, spousal support, and attorney fees for later trial. That trial was held in November 1991, and in March 1992 the court entered an amended decree of dissolution supported by amended findings of fact and conclusions of law.

At the time of trial, Dr. Luckey was a 61-year-old surgeon whose practice was confined to plastic surgery. He was not board certified. He had practiced in the Tri-Cities area for 30 years. Less than a year before his marriage to Ms. Luckey, he had terminated his practice at the Richland Clinic and started his own medical practice.

Ms. Luckey was a 51-year-old registered nurse at the time of trial. She held a 4-year degree in psychology when she married Dr. Luckey. By 1975, she had earned her A.A. degree in nursing and was working in Dr. Luckey's surgical practice. She worked there for 9 years as a nurse and administrator. She drew no salary, but the business paid various personal expenses as partial reimbursement for services rendered.

Dr. Luckey's medical practice, which the court and the experts considered as a whole, was conducted through three wholly owned corporations: one for his own professional services;[1] one which provided support services for his practice and the practices of several doctors who shared space in his building;[2] and one which operated his surgical suite inside the building.[3] The corporations paid many of Dr. Luckey's personal expenses.

Although he lost many of his referrals when he left the Richland Clinic, he was able to rebuild his referral sources within about 18 months of starting his new practice. Dr. Luckey testified that his practice grew because patients knew about his ability to do face lifts, breast augmentations, and other procedures and were so pleased with the results they told others. He became well known for his skill and the privacy afforded by his surgical suite. Lawyers frequently consulted him on tort cases.

The Luckeys' standard of living during the marriage was modest compared with other doctors. Dr. Luckey's average gross annual income was about $85,000, an income level significantly less than similarly situated colleagues, and

[1]Dr. Robert C. Luckey, M.D., P.S.

[2]Medical Central Service (MCS).

[3]Mid-Columbia Surgical Suite.

much less than other general surgeon practitioners in the Tri-Cities area. They drove modest cars and lived in a relatively small house.

Ms. Luckey called two experts, Clarence Selvog, CPA, and James Topliff, attorney and CPA, to value the goodwill of Dr. Luckey's medical practice. They concluded Dr. Luckey's practice had a goodwill value of more than $100,000 based on assumptions that he was not a plastic surgeon but a general practitioner or surgeon and that his earnings were well above $85,000 per year. They applied the capitalization of excess earnings approach to reach their conclusions about the value of his practice's goodwill.

Dr. Luckey called one expert, Ralph Arnold, CPA, of Willamette Management. Mr. Arnold also used the capitalization of excess earnings approach, but he believed that different assumptions were warranted. He testified Dr. Luckey was a plastic surgeon, comparable plastic surgeons made much more than he did, and there were no excess earnings to be capitalized. Thus, he concluded the value of the practice's goodwill was zero.

The Luckeys had one child, a boy born in August 1980. Although conceding there was no evidence Dr. Luckey sexually abused his son, Ms. Luckey requested that Dr. Luckey's visits with his son be supervised because he fit the psychological profile of a child molester and hence posed a danger of future sexual abuse to the child.

One of Ms. Luckey's experts was Dr. Bruce Duthie, a psychologist, who stated that one of Dr. Luckey's stepdaughters from a previous marriage told him Dr. Luckey had sexually abused her when she was young. Dr. Duthie also explained that he had administered the Minnesota Multiphasic Personality Inventory (MMPI) to Dr. Luckey and concluded that his scaled scores matched the profiles of known child molesters. Ms. Luckey also submitted letters from Dr. Donald Roberts, the boy's counselor, and called Laurie Miller, who had a master's degree in counseling psychology, to establish the child would not be safe with Dr. Luckey and could not protect himself. There was undisputed

testimony that Dr. Luckey had struck Ms. Luckey on at least two occasions and had frequent extramarital affairs.

Since her separation from Dr. Luckey, Ms. Luckey had moved to Spokane with their son, where she was working part time and finishing a bachelor's degree at Gonzaga University. Her gross income from her job was $18,000 per year. Dr. Luckey paid her $22,800 in the first year of separation as combined child support and spousal support. He also made other payments as ordered by the court.

The trial court valued the goodwill of Dr. Luckey's medical practice at zero, granted him unsupervised visitation with his son one weekend per month, plus 2 weeks in the summer and alternating holidays, and denied Ms. Luckey's request for spousal maintenance beyond what was paid in the first year of separation. This appeal followed.

Ms. Luckey first contends that the court erred in ruling that Dr. Luckey's medical practice had no goodwill.

Goodwill is often defined as the " 'expectation of continued public patronage' ". *In re Marriage of Hall*, 103 Wn.2d 236, 239, 692 P.2d 175 (1984) (quoting *In re Marriage of Lukens*, 16 Wn. App. 481, 483, 558 P.2d 279 (1976), *review denied*, 88 Wn.2d 1011 (1977)); *In re Marriage of Brooks*, 51 Wn. App. 882, 884, 756 P.2d 161, 79 A.L.R.4th 159, *review denied*, 111 Wn.2d 1021 (1988). Another common definition describes goodwill as the expectation " 'that the old customers will resort to the old place.' " *Lukens*, at 485 (quoting *In re Marriage of Foster*, 42 Cal. App. 3d 577, 582, 117 Cal. Rptr. 49, 52 (1974)).

■ ■ Washington recognizes professional goodwill as intangible property subject to division in a marriage dissolution. *Hall*, at 238-39; *Brooks*, at 884. Although professional goodwill may not be readily marketable, the important consideration is not whether it can be sold to another party, but whether it has value to the professional. *Hall*, at 239; *Brooks*, at 884; *Lukens*, at 486. When a professional retires or dies, the goodwill that once attached to his or her practice may continue to exist, attaching to former partners or buyers of the practice. *Hall*, at 241.

Questions of professional goodwill are determined by considering such factors as the practitioner's age; health; past earning power; reputation in the community for judgment, skill, and knowledge; and comparative professional success, though these factors do not appear to be exclusive. *In re Marriage of Fleege*, 91 Wn.2d 324, 326, 588 P.2d 1136 (1979).[4] *See also Hall*, at 242; *In re Marriage of Nordby*, 41 Wn. App. 531, 537, 705 P.2d 277 (1985); *Lukens*, at 484.

The court applies the *Fleege* factors in a 2-step process, determining (1) whether goodwill exists and (2) if so, its value according to acceptable accounting methods. *Hall*, at 242; *In re Marriage of Zeigler*, 69 Wn. App. 602, 607, 849 P.2d 695 (1993). Valuation of goodwill is a question of fact; findings of fact supported by substantial evidence will not be reversed on appeal. *Hall*, at 246.

In the second phase, valuation of existing goodwill, the *Fleege* factors cannot be used in isolation; one or more accepted methods of valuation must be employed, though the particular method depends on the offered proof. *Hall*, at 243. *Hall*, at 243-45, mentioned five accounting methods in particular: straight capitalization, capitalization of excess earnings, the IRS variation of capitalized excess earnings, the market value method, and the buy/sell agreement method.

■■ These five methods are not exclusive, and one or more methods may be used in conjunction with the *Fleege* factors; the overall goal is to achieve a just and fair evaluation of the existence and value of a professional's goodwill. *Hall*, at 245. The trial court must set forth on the record which factors and accounting method were used in reaching its finding, otherwise its finding as to goodwill will be deemed unsupported by sufficient evidence, reversed, and remanded for proper findings. *Hall*, at 247.

In this case the first phase of analysis, the existence of goodwill, has not been contested either at trial or in the

---

[4]Contrary to Ms. Luckey's position, one spouse's contribution to the other spouse's professional practice is not a factor bearing on the *existence* or *value* of goodwill. Rather, under the principles of community property law, the spouse by virtue of being a spouse has contributed to the community and is entitled to be compensated for that contribution. *Fleege*, at 328 (quoting *Foster*, at 584).

briefs on appeal. Rather, both sides called experts to render opinions on the value of the goodwill. The court found the testimony of Dr. Luckey's expert, Mr. Arnold, to be the most credible. Following Mr. Arnold's analysis, the court found the value of the goodwill to be zero.[5] Mr. Arnold specified the *Fleege* factors he relied on — Dr. Luckey's age, health, and (declining) past earning power. He said that he found the capitalization of excess earnings method to be the most reliable, and used it as the basis for his opinion. Thus, there is a sufficient record of the factors and methods the court used to reach its finding.

The court's finding of fact valuing the goodwill at zero is supported by substantial evidence. Dr. Luckey testified that his age was 61. Experts testified Dr. Luckey had suffered health impairments and could no longer perform as he had in the past. Mr. Arnold testified that Dr. Luckey's past earning power, since age 55, had begun to decline and would continue to do so. As noted above, Mr. Arnold testified extensively about his reliance on the capitalization of excess earnings method. He followed the methodology of Ms. Luckey's experts closely, explaining how he used the same formula but employed different assumptions.

The court's decision to follow Mr. Arnold's classification of Dr. Luckey as a plastic surgeon in order to find a comparable doctor's salary is supported by substantial evidence. There was testimony that Dr. Luckey was classified by the American Medical Association as a plastic surgeon, held himself out as a plastic surgeon, and his functions and equipment were those of a plastic surgeon. The court's other findings on the goodwill issue are also supported by substantial evidence. Thus, the court did not err in valuing the goodwill of Dr. Luckey's practice.

Ms. Luckey next argues that the trial court abused its discretion because its reasons for rejecting supervised visitation were untenable.

---

[5]The court's finding of fact 7(a) stated that the parties' property was valued as set forth in attached exhibit A. Exhibit A listed an entry for the goodwill of Dr. Luckey's medical practice and listed that value as "$0.00".

■ In matters dealing with the welfare of children, trial courts are given broad discretion. *In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983). Trial courts are given this broad discretion because they have the great advantage of personally observing the parties. *In re Marriage of Timmons*, 94 Wn.2d 594, 600, 617 P.2d 1032 (1980). The trial court's disposition of a case involving rights of custody and visitation will not be disturbed on appeal unless the court manifestly abused its discretion. *Cabalquinto*, at 327. Abuse of discretion is defined as discretion exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971); *Coggle v. Snow*, 56 Wn. App. 499, 507, 784 P.2d 554 (1990).

The trial court made several findings of fact on the issue of supervised visitation: (1) Dr. Duthie's opinion relied on psychological testing of questionable value; furthermore, Dr. Duthie himself did not insist on supervised visitation; (2) Dr. Roberts' opinion did not show any basis for supervised visitation; (3) there was no evidence that Dr. Luckey had acted sexually inappropriately with his son, and his son was old enough to protect himself and disclose improprieties; and (4) the son was not in any present danger, and a normal father/son relationship should be reestablished.

■ These findings are supported by substantial evidence. Dr. Duthie's use of the MMPI tests was questionable — he admitted on cross examination that he had said so himself in publications he had written. Moreover, the use of profile testimony is unfairly prejudicial; in criminal cases, the courts have ruled that "profile testimony that does nothing more than identify a person as a member of a group more likely to commit the charged crime is inadmissible owing to its relative lack of probative value compared to the danger of its unfair prejudice." *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992) and cases cited therein.

As for Dr. Roberts' letters, we have reviewed them and concur with the trial court; they do not reveal any basis for supervised visitation. There was no evidence that Dr. Luckey had acted sexually inappropriately with his son. In fact, Dr.

Duthie twice recommended that Dr. Luckey be allowed unsupervised visitation with his son for one 3-day weekend a month.

On the basis of the court's factual findings, which are supported by substantial evidence, the court did not abuse its discretion in allowing Dr. Luckey unsupervised visitation for one weekend per month; indeed, the court followed the recommendation of *Ms. Luckey's* expert in so ruling. The court also allowed additional visitation for 2 weeks during the summer and on alternating holidays, but given the findings already noted, this was not an abuse of discretion.

Ms. Luckey next argues that the court's low spousal maintenance award was an abuse of discretion.

■ Spousal maintenance, formerly known as alimony, is not awarded as a matter of right. *Friedlander v. Friedlander*, 80 Wn.2d 293, 297, 494 P.2d 208 (1972); *In re Marriage of Irwin*, 64 Wn. App. 38, 55, 822 P.2d 797, *review denied*, 119 Wn.2d 1009 (1992). The purpose of spousal maintenance is to support a spouse, typically the wife, until she is able to earn her own living or otherwise becomes self-supporting. *Irwin*, at 55.

The award of maintenance is within the discretion of the trial court. *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). The trial court's discretion in this area is wide. *Bulicek*, at 634. The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just. *Bulicek*, at 633.

The relevant factors which the court must consider include the financial resources of each party; the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; the standard of living during the marriage; the duration of the marriage; and the time needed by the spouse seeking maintenance to acquire education necessary to obtain employment. RCW 26.09.090; *In re Marriage of Vander Veen*, 62 Wn. App. 861, 867, 815 P.2d 843 (1991); *In re Marriage of Sheffer*, 60 Wn. App. 51, 53-54, 802 P.2d 817 (1990).

The trial court concluded that no further spousal maintenance was warranted. Its relevant conclusion of law stated that it had considered the statutory factors and also the level of support paid in the first year of separation ($22,800),[6] the level of child support ($785 per month), the fact that the property division was unequal in favor of Ms. Luckey,[7] Dr. Luckey's additional payment of $21,000 to Ms. Luckey in June 1991, and Ms. Luckey's ability to find full-time work soon.

We cannot say the trial court abused its discretion. Ms. Luckey was able to find full-time work. Dr. Luckey was 61 in 1991, approaching retirement, and experiencing diminished earning capacity. In light of these factors, the court did not abuse its discretion.

■ Finally, Ms. Luckey contends that she is entitled to an award of attorney fees and costs on appeal. In determining whether to award attorney fees on appeal, the court examines the arguable merit of the issues on appeal and the financial resources of the respective parties. *In re Marriage of Vander Veen, supra* at 869. Having done so, we deny any fee award on appeal.

We affirm the trial court and decline to award fees or costs on appeal.

THOMPSON, C.J., and MUNSON, J., concur.

---

[6]From June to August 1987, Dr. Luckey paid $1,600 per month as combined temporary child support and spousal support. From September 1987 to June 1988 he paid $2,000 per month, for a total of $22,800 in the first year of separation.

[7]She received $140,454 in community property and an additional $51,305 equalization payment. After being adjusted for back child support due her, and the $2,000 monthly payments Dr. Luckey had been making for 40 months, the equalization amount outstanding was $2,705. The court decided to make an unequal distribution of the community property and increased this amount by $9,295 to a total amount due of $12,000, to be paid at the rate of $500 per month.