[No. 17911-3-II.   Division Two.   July 12, 1996.]

*In the Matter of the Marriage of* JAMES J. CROSETTO, *Appellant*, and LAUREL E. CROSETTO, *Respondent*.

---

548

*Bruce T. Clark*, for appellant.

*Ross E. Taylor*; and *Terrence F. McCarthy* and *McCarthy, Holum, Causseaux & Rourke, Inc., P.S.*, for respondent.

HOUGHTON, A.C.J. — James J. Crosetto appeals from

the trial court's property distribution, business valuation, and denial of child support and attorney fees in an action dissolving his marriage to Laurel E. Crosetto. We affirm in part, reverse in part and remand for proceedings consistent with this opinion.

## FACTS

James and Laurel Crosetto were married on August 10, 1970. During the marriage they adopted a child, Mary Alice, who was born on February 7, 1984. James and Laurel Crosetto separated on May 15, 1991.

Laurel Crosetto is certified to teach kindergarten through sixth grades. She taught school during the early years of the parties' marriage. The Crosettos moved to Guam for a year and Laurel Crosetto taught second grade there. After their return to Washington, Laurel Crosetto worked as a substitute teacher until Mary Alice was adopted. The Crosettos agreed that Laurel Crosetto would not work while Mary Alice was a baby.

Following their separation in spring of 1991, Laurel Crosetto applied for a position with the Tacoma School District, and again in 1992 and 1993. At the time of trial, she was working full time as a substitute teacher with the Tacoma School District for $100 a day. Laurel Crosetto testified she was still looking for a full time teaching position but that elementary positions were limited.

Laurel Crosetto made several allegations of abuse against James Crosetto that were ultimately determined to be unfounded. She testified that James Crosetto was abusive to her and Mary Alice during the marriage. As a result of Laurel Crosetto's allegations of abuse, James Crosetto had court-ordered supervised visitation with Mary Alice. Laurel Crosetto described bruises and other injuries she noticed on Mary Alice following her visits with James Crosetto. Laurel Crosetto stated she was not able to take Mary Alice to a doctor, and admitted these bruises were not reflected in the supervisor's report. James

Crosetto denied physically abusing Laurel Crosetto, but admitted to slapping her on two occasions.

Laurel Crosetto also suspected that Mary Alice had been sexually abused after she discovered some pictures Mary Alice drew of James Crosetto in the nude. She found the pictures in February 1992 and showed them to a doctor in March 1992. A pediatrician examined Mary Alice and did not discover any evidence of penetration. James Crosetto denied ever exposing himself to Mary Alice.

These allegations of abuse eventually resulted in court-ordered supervised visits between James Crosetto and Mary Alice. Child Protective Services conducted an investigation in April 1992, based upon the allegations of sexual abuse. Child Protective Services determined there was no risk and closed its case. A second investigation was conducted in August 1992, which led to a dependency petition being filed. The petition was later dismissed due to unfounded allegations.

James Crosetto had supervised visitation until August 1992. The trial court then awarded primary care to him after Laurel Crosetto was warned not to interfere with his visitation and to comply with court orders. The trial court ordered supervised visitation between Laurel Crosetto and Mary Alice.

Janice Pitt, a Parenting Investigator, stated in her report that Mary Alice appeared to be comfortable with her father during their visits, and that James Crosetto demonstrated "appropriate parenting skills." Pitt also stated that it was doubtful that Mary Alice drew the pictures of her father, and that the child denied drawing them. She also believed that Laurel Crosetto behaved inappropriately at times during her visits with Mary Alice and opined that Laurel Crosetto was unable to meet the emotional needs of her child.

James Crosetto owns a real estate appraisal business. He has worked as an independent appraiser since March 1983, and primarily performs residential appraisals. He is not licensed to do commercial appraisals. James Crosetto

performs contract work for mortgage lenders, insurance companies, and banks, but very little (less than one percent) for the general public. In order to do appraisals for federally insured lending institutions, he must submit a package and receive a vote of approval by a board each year. He does not have the same clients each year. James Crosetto has an office in Tacoma. His name and number are listed under Appraisers in the telephone directory, but there is no advertisement in the directory.

James Crosetto testified that he lent Laurel Crosetto's mother (Alice Mack) $103,000 between 1988 and 1991 for a building rehabilitation project and that this loan was not repaid. He also stated he borrowed some money from his mother in order to make the loan to Mack. He stated that the bank foreclosed on Mack's property but did not look to him for payment. James Crosetto identified a promissory note signed by him and Mack, acknowledging the loan to her.

James Crosetto testified about his business assets, including $2000 in accounts receivable, a computer, printer, and other equipment, and stated that the total value of the business was worth $3000 to $5000. He stated that he owed $15,000 to the IRS and over $50,000 to his mother. He testified that he paid Laurel Crosetto $400 a week until October 1991, and $200 a week thereafter, made the house and utilities payments, and paid other bills.

Michael Gocke, a CPA, testified that there was no goodwill in James Crosetto's business. He compared the business with that of an anesthesiologist or a pathologist. He determined the value of the business was $2040 (assets minus liabilities).

David Nelson, also a CPA, valued the business at $125,582 and attributed this entire value to goodwill. He based this valuation upon a determination of gross income less operating expenses and multiplying the average by a factor of 1.5. He also testified about the concepts of "stream of income" and goodwill.

Child support worksheets submitted at trial indicate James Crosetto's business income is $3205 a month, with net monthly income of $2447.50. Laurel Crosetto's monthly net income is listed as $1756.05. In its oral ruling, the trial court stated that James Crosetto was capable of earning $75,000 a year.

The trial court awarded "custody" of Mary Alice to James Crosetto, and secondary "custody" (unsupervised) to Laurel Crosetto.[1] The trial court awarded James Crosetto a car, boat and trailer, bank account, retirement plan, appraisal business (valued at $50,000), and various items of personal property. Laurel Crosetto was awarded the family home, a car, money owing to the community by her mother (which the trial court found unlikely would be paid due to her bankruptcy) and various personal property.

The trial court found that the community debts included the first mortgage ($54,000), the second mortgage (estimated at $14,000 but later corrected to $11,101.25), IRS debt ($14,000), a Sears auto loan ($800), and the loan from Rose Crosetto ($34,000). James Crosetto's remaining separate debts and liabilities consisted of his attorney fees of $15,000.

The trial court found that Laurel Crosetto's separate debts consisted of attorney fees in excess of $25,000 and $5000 owed on a Discover card. James Crosetto was ordered to pay the second mortgage ($11,101.25), Sears loan ($800), debt to Rose Crosetto (estimate $34,000), and his obligations incurred since separation. However, the trial court stated that it did not expect that James Crosetto would be required to pay back his mother, "in view of her condition and the fact that he's the sole heir." Laurel Crosetto was ordered to pay the first mortgage ($54,000), the Discover card balance ($5000), and her

---

[1]We recognize that the term "custody" as used by the trial court applies to the residential schedule set forth in a parenting plan, but that the term is retained for purposes of other state and federal statutes which require designation of custody. RCW 26.09.184(5); RCW 26.09.285.

obligations incurred since separation. James Crosetto sought $52,000 in attorney fees and costs. The parties were ordered to pay their own attorney fees and costs. James Crosetto appeals.

## ANALYSIS

### A. Business Valuation

James Crosetto first contends that the trial court erred in determining his business had intangible value. He asserts that the business has no goodwill and that a finding of intangible value of the business cannot be used as a substitute for goodwill. He further asserts that the value of the business is $5,000, or the value of its tangible assets and accounts receivable.

The existence of goodwill is a question of fact. *In re Marriage of Knight*, 75 Wn. App. 721, 726, 880 P.2d 71 (1994), *review denied*, 126 Wn.2d 1011 (1995). A valuation of goodwill is also a question of fact. *In re Marriage of Luckey*, 73 Wn. App. 201, 206, 868 P.2d 189 (1994). Findings of fact supported by substantial evidence will not be reversed on appeal. *Luckey*, 73 Wn. App. at 206. Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise. *In re Marriage of Hall*, 103 Wn.2d 236, 246, 692 P.2d 175 (1984).

Goodwill has been defined as the " 'expectation of continued public patronage.' " *Hall*, 103 Wn.2d at 239 (quoting *In re Marriage of Lukens*, 16 Wn. App. 481, 483, 558 P.2d 279 (1976), *review denied*, 88 Wn.2d 1011 (1977)). Goodwill has also been described as "a property or asset which usually supplements the earning capacity of another asset, a business or a profession" and is not the earning capacity itself. *Hall*, 103 Wn.2d at 241. Professional goodwill is recognized in Washington as intangible property subject to division in a marriage dissolution. *Luckey*, 73 Wn. App. at 205.

Professional goodwill is determined by considering

the *Fleege*[2] factors, which include, but are not limited to: the practitioner's age; health; past earning power; reputation in the community for judgment, skill, and knowledge; and comparative professional success. *Luckey*, 73 Wn. App. at 206. The *Fleege* factors are applied in a two-step process, whereby the trial court first determines whether goodwill exists, then determines its value according to accepted accounting methods. *Luckey*, 73 Wn. App. at 206.

Five accounting methods are generally recognized, including straight capitalization, capitalization of excess earnings, the IRS variation of capitalized excess earnings, the market value method, and the buy/sell agreement method. *Luckey*, 73 Wn. App. at 206. This is not an exclusive list and one or more methods may be used in conjunction with the *Fleege* factors in determining value with the ultimate goal of achieving a fair and just evaluation of the existence and value of the professional's goodwill. *Luckey*, 73 Wn. App. at 206. The trial court must state on the record which factors and accounting method were used in arriving at its finding; failure to do so will deem the valuation to be unsupported by sufficient evidence, necessitating reversal and remand for proper findings. *Hall*, 103 Wn.2d at 247; *Luckey* 73 Wn. App. at 206.

In this case, Gocke testified that he did not believe goodwill existed. He opined that factors such as James Crosetto's age (47), relatively good health, and good reputation weighed in favor of finding goodwill, but other factors such as his office-sharing arrangement, month-to-month lease, no advertisement in the Yellow Pages, and not routinely dealing with the general public weighed against its existence.

Nelson, on the other hand, testified that he determined the business had goodwill value of $125,582. He stated that he used James Crosetto's gross income for four years, less operating expenses, averaged that income and multiplied it by 1.5 percent. Nelson stated there was

[2]*In re Marriage of Fleege*, 91 Wn.2d 324, 588 P.2d 1136 (1979).

"inherent value because this man has an ability to create income, a stream of cash" and that this could be called either goodwill or "the value of the business." Nelson considered such factors as age and the cyclical nature of the business. He agreed that there was value in James Crosetto's ability to earn income and stated further:

> He is an established professional and he has a name out there. Inherent in that established name is value. You can call it goodwill, you can call it an income stream, you can call it an intangible asset, you can call it anything you want, but there is a value and we put a hard dollar number to it.

He basically considered the terms "goodwill" and "inherent market value" as the same thing.

The trial court stated that James Crosetto's appraisal business was valued at $50,000, and listed it as community property and awarded it to him. The trial court stated during presentation of findings of fact that it was reluctant to label the $50,000 valuation figure "goodwill" but that it believed there was inherent value in the business.

We cannot determine from the record before us whether the trial court actually found "goodwill." Once the trial court finds goodwill, it must set forth on the record the factors and method used in reaching a finding of goodwill *and* its value. *Hall*, 103 Wn.2d at 247; *see also In re Marriage of Monaghan*, 78 Wn. App. 918, 927-28, 899 P.2d 841 (1995). Because the trial court here did not state how it reached the valuation figure, we remand and direct the trial court to set forth the factors and methods used in valuation if it indeed finds goodwill exists.

*B. Property Division*

■ ■ James Crosetto next contends that the trial court abused its discretion by awarding "virtually all of the net community assets" to Laurel Crosetto, resulting in a property division that is "vastly disproportionate." He also argues that the trial court erred in awarding Laurel Crosetto the " 'net equity' " in the house, rather than the value of the house, and that the trial court failed to al-

locate the IRS debt. A trial court's division of marital property will not be reversed absent a showing of manifest abuse of discretion. *In re Marriage of Wright*, 78 Wn. App. 230, 234, 896 P.2d 735 (1995). Appellate review is limited to whether the trial court's distribution of property was fair and equitable. *Wright*, 78 Wn. App. at 234. The parties' relative health, age, education and employability are considered in property divisions, and the ultimate concern is the economic condition of the parties upon the dissolution decree. *In re Marriage of Mathews*, 70 Wn. App. 116, 121, 853 P.2d 462, *review denied*, 122 Wn.2d 1021 (1993).

RCW 26.09.080 requires that the trial court make a "just and equitable" distribution of the parties' property and liabilities. The statute sets forth a non-exclusive list of factors to be considered by the trial court, including the nature and extent of the community property, the nature and extent of the separate property, duration of the marriage, and the resulting economic circumstances of each spouse when the property is divided.

An equitable division of property does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties. *In re Marriage of Rink*, 18 Wn. App. 549, 553, 571 P.2d 210 (1977) (citing *In re Marriage of Clark*, 13 Wn. App. 805, 538 P.2d 145, *review denied*, 86 Wn.2d 1001 (1975)).

The trial court stated it awarded Laurel Crosetto 60 percent of the community assets. The trial court awarded her the equity in the family home (which was computed to be $82,000), a car valued at $1000, and personal property and effects valued at $10,730 for a total of $93,730.00. James Crosetto was awarded a car, boat, bank account, retirement plan, value of his business ($50,000), and personal property and effects for a total value of

$62,325.00.[3] James Crosetto was ordered to pay the second mortgage, Sears loan, automobile loan and debt to Rose Crosetto. Laurel Crosetto was ordered to pay the first mortgage and the Discover card debt. The trial court corrected the findings of fact to include the IRS debt as a community obligation. However, the trial court did not allocate the IRS obligation to either party.

James Crosetto's attempts to distinguish *Rink, Dessauer,* and *Donovan* are unpersuasive. On review, we must look beyond a facially inequitable division and determine whether the property division is fair and equitable, based upon consideration of all the facts and circumstances. *In re Marriage of Donovan,* 25 Wn. App. 691, 696-97, 612 P.2d 387 (1980).

The Crosettos were married for 21 years. The trial court noted that Laurel Crosetto was 47 years old, that her standard of living will be somewhat diminished and that James Crosetto's earning capacity was superior to hers. Future earning potential is a factor that may be considered in making a just and equitable property division. *Hall,* 103 Wn.2d at 248. As discussed below, the trial court may also consider maintenance when making a property distribution.

James Crosetto fails to demonstrate that the division was not just and equitable, despite an award of the " 'net equity' " in the house to Laurel Crosetto rather than its value. Because we remand on the issue of goodwill, the trial court has the discretion to adjust the property division depending upon valuation of goodwill. The trial court must also allocate the IRS debt.

*C. Spousal Maintenance*

James Crosetto further contends that the trial court

---

[3]The trial court determined the house had a value of $150,000 and determined equity by deducting the first mortgage of $54,000 and the second mortgage of $14,000 ($150,000 - 68,000 = 82,000). However, it was later determined that the second mortgage was $11,101.25. Equity would then be $84,899. James Crosetto deducts only the first mortgage (which she was ordered to pay) and not the second (which he was ordered to pay) when he claims Laurel Crosetto received $96,000 net equity in the house.

erred in finding Laurel Crosetto was entitled to spousal maintenance and in using this finding as a basis for awarding her a disproportionate share of the community property. He asserts that a $700 difference between his and Laurel Crosetto's incomes does not warrant an entitlement to maintenance, and that the trial court erred in finding he had the ability to pay maintenance.

■ A maintenance award is within the trial court's discretion. *Mathews*, 70 Wn. App. at 123. An award of maintenance that is not based upon a fair consideration of the statutory factors constitutes an abuse of discretion. *Mathews*, 70 Wn. App. at 123.

RCW 26.09.090 sets forth factors to be considered in granting a maintenance order. These include: the financial resources of the party seeking maintenance, *including separate or community property apportioned to the party* (emphasis added); the time it would take to acquire education or training to enable that party to find appropriate employment; the standard of living established during the marriage; the duration of the marriage; the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance, and the ability of the other spouse to meet his or her needs while meeting those of the spouse seeking maintenance.

Laurel Crosetto sought $1500 a month maintenance. The trial court addressed the parties' earning abilities and standard of living in its Memorandum Decision.

In its Findings of Fact, the trial court stated:

> The wife is in need of spousal maintenance. However, she is receiving a disproportionate share of the parties' assets . . . . While the petitioner's earning ability is substantially superior . . . the respondent's income should markedly improve when she obtains a regular teaching contract as opposed to her now permanent substitute position.

The trial court also found that James Crosetto had the ability to pay maintenance. The trial court declined to award maintenance and instead awarded Laurel Crosetto

an unequal share of the community property (60 percent) and relieved her of a child support obligation.

We addressed a similar argument in *Rink*, 18 Wn. App. at 552-53. In *Rink*, the wife was awarded custody, child support, maintenance of $200 a month for 12 months, and two-thirds of the community assets. On appeal, the husband argued that a trial court could not make an unequal division of property in exchange for a reduction of a maintenance award to the spouse receiving the larger share of the property. He asserted that the trial court's disposition of property cannot be influenced by the amount of maintenance and vice versa. We rejected the argument and held that a trial court must not only consider the division of property when determining maintenance, but also must consider the amount of maintenance it intends to grant when dividing property. *Rink*, 18 Wn. App. at 552-53. We found no abuse of discretion because the trial court considered all the relevant statutory factors in its distribution, and there was no indication that the court divided the property solely on the ground that the wife would receive a small maintenance award. *Rink*, 18 Wn. App. at 554.

Similarly, in this case, the trial court considered the relevant factors regarding maintenance and property division. Under RCW 26.09.090(1)(a) and 26.09.080 the trial court was entitled to consider the property division in its determination of maintenance, and to consider maintenance in its property division. The trial court did not abuse its discretion.

### D. Child Support

James Crosetto further contends that the trial court did not set forth adequate reasons for deviating from the child support schedule. He asserts that disparity in earning capacity cannot be used as a basis for a downward deviation, or to completely relieve a parent from a duty of support. He also argues that Laurel Crosetto's debts resulting from this trial were voluntarily incurred and cannot be used under the statute for deviating from the support schedule.

■ A trial court's setting of child support will not be disturbed on appeal unless the spouse challenging the decision demonstrates a manifest abuse of discretion. *In re Marriage of Booth*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990).

■ When setting child support, the trial court must first compute the total income of the parents (RCW 26.19.071); determine the standard child support level from the economic table (RCW 26.19.020); decide whether to deviate from the standard calculation, based upon consideration of statutory factors (RCW 26.19.075); and allocate each parent's support obligation (RCW 26.19.080). *In re Marriage of Maples*, 78 Wn. App. 696, 700, 899 P.2d 1 (1995). The trial court must set forth specific reasons for deviating from the standard calculation in written findings of fact, which must be supported by the evidence. *Maples*, 78 Wn. App. at 701. However, the lack of a trial court's specific findings is not fatal, and in the absence of a finding on a particular issue, an appellate court may look to the oral opinion to determine the trial court's basis for the deviation. *Booth*, 114 Wn.2d at 777.

In this case, the trial court relieved Laurel Crosetto of her obligation to pay child support due to "a disparity in earning capacity and because of substantial obligations of the wife to pay attorney's fees and other costs associated with mental health professionals hired by [her] during trial."

James Crosetto argues that the trial court intended the relief from child support to be permanent. However, our review of the colloquy on the matter indicates the trial court was aware that a support obligation is not permanent, but subject to modification.[4] Indeed, RCW 26.09.170 provides for modification of a child support order.

---

[4] MR. PRINCE: I indicated that she had a need but that there would be no maintenance because of the disproportionate share of assets.

THE COURT: And the relief from the support obligation.

RCW 26.19.075 sets forth a non-exclusive list of reasons for departing from the standard calculation including:

> **Debt and high expenses.** The court may deviate from the standard calculation after consideration of the following expenses:
>
> > i. Extraordinary debt not voluntarily incurred;
> >
> > ii. A significant disparity in the living costs of the parents due to conditions beyond their control; . . . .

RCW 26.19.075(c).

Laurel Crosetto testified that she made $100 a day as a substitute teacher, and her worksheets indicated her net income was $1756.05 per month. Laurel Crosetto also testified as to her legal expenses, and the trial court found she owed fees in excess of $25,000. James Crosetto's net monthly income was listed as $2447.50. However, his estimated gross income was $7000 and estimated net income was $2038. Nelson testified as to discrepancies between James Crosetto's gross income and bank records, such as a reported gross income of $45,825 in 1991, compared to bank records showing $70,400. The trial court

---

MR. MCCARTHY: Is that relief from the support obligation permanent, Your Honor? In other words, the child—

THE COURT: Oh, the support obligation, support is never permanent. It is always subject to modification, I believe.

MR. MCCARTHY: I was just wondering.

THE COURT: I think federal law requires modification every three years. I don't know when they are ever going to get that cranked up.

MR. MCCARTHY: I was just wondering, since you were giving her relief from child support in lieu of maintenance, if you had a time period that you intended to use in conjunction with that, Your Honor. I mean as opposed to us going into —

THE COURT: No, my decision was to make it permanent, at least so long as there is an obligation of child support.

MR. MCCARTHY: That she not have one?

THE COURT: However, you know, for future modification purposes, if, for example, Mr. Crosetto should become disabled and Mrs. Crosetto should get a teaching contract worth $50,000 a year, obviously these things have to be subject to future modification, and I can't prohibit that.

stated in its oral ruling that James Crosetto was capable of earning $75,000 a year.

The trial court could have concluded that there was a disparity of earning capacity. Although RCW 26.19.075 does not specifically list disparate earning capacity or incomes as a reason for deviation, the trial court is not limited to the listed reasons when deciding whether to deviate from the presumptive schedule amount. RCW 26.19.075(1).

In *In re Marriage of Glass*, 67 Wn. App. 378, 387,. 835 P.2d 1054 (1992), the court upheld the trial court's upward deviation from the child support schedule. In that case, the father petitioned for modification based upon changed financial circumstances after filing for bankruptcy. The trial court found that he had earned significantly more money in the past and was capable of earning significantly more in the future, and ordered him to pay support that exceeded 50 percent of his current net monthly earnings. On appeal, the court held that the trial court did not err in ordering an upward deviation based upon substantial evidence that the father's earnings represented only a fraction of his economic resources, that his financial setbacks were temporary, his income would likely increase in the near future, and that he had maintained a relatively comfortable lifestyle. *Glass*, 67 Wn. App. at 386-88.

According to *Glass*, earning capacity may be considered when making an upward deviation. It likewise could be considered in a downward deviation. Laurel Crosetto's income, although less than James Crosetto's, might warrant a downward departure, but it does not warrant complete relief from a support obligation. RCW 26.19.020 provides that for incomes less than $600, the obligation is based upon the resources and living expenses of each household, and that minimum support shall not be less than $25 per child per month. Although there was evidence in the record to support the trial court's finding regarding earning capacity and Laurel Crosetto's expenses justifying a downward departure, these reasons do not merit a complete elimination of a support obligation.

The trial court abused its discretion in relieving Laurel Crosetto of any child support obligation. On remand, the trial court must follow the procedure for setting child support as discussed above, and set forth specific reasons for deviating from the standard calculation in written findings of fact.

*E. Attorney Fees*

James Crosetto finally contends that the trial court abused its discretion by denying him attorney fees. He asserts that the trial court "found" intransigence on Laurel Crosetto's part and should have awarded fees on that basis without a consideration of her ability to pay. He also argues that the property division provides her with substantial assets from which she could pay those fees.

The decision to award attorney fees is within the trial court's discretion. *Knight*, 75 Wn. App. at 729. The party challenging the trial court's decision bears the burden of proving the trial court exercised its discretion in a way that was "clearly untenable or manifestly unreasonable." *Knight*, 75 Wn. App. at 729.

RCW 26.09.140 states in pertinent part:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorney's fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment . . . .

Generally, when determining an award of attorney fees, the trial court must first balance the needs of the spouse requesting them against the ability of the other spouse to pay. *Knight*, 75 Wn. App. at 729. The court may also consider the extent to which one spouse's intransigence caused the spouse seeking a fee award to require additional legal services. *In re Marriage of Morrow*, 53 Wn.

App. 579, 590, 770 P.2d 197 (1989). If intransigence is established, the financial resources of the spouse seeking the fees are irrelevant. *Morrow,* 53 Wn. App. at 590.

James Crosetto asserts that the trial court "found" intransigence on Laurel Crosetto's part. He cites to the trial court's comments, and states that "[n]o other word is available to characterize the conduct described by the trial court." We agree. Although the trial court did not make a finding of intransigence, a review of the record discloses a continual pattern of obstruction on Laurel Crosetto's part.[5]

Preceding its discussion of child custody, the trial court stated in its Memorandum Decision:

> Respondent was angered and upset by the filing of this action. She made allegations of domestic violence which resulted in court orders awarding her temporary custody of Mary Alice and restricted and supervised visitation to petitioner. Even with those restrictions, she utilized allegations of illness, conflicts of schedule and the like to thwart contact between petitioner and their daughter. As the conflict grew, allegations of sexual abuse were later made which resulted in appointment or utilization of professional experts, juvenile court proceedings, police investigations and child protective service complaints. Even though certain experts claimed the daughter once supported a claim that she had seen her father undressed, it was never determined that such was in anything other than an ordinary family situation, and she continues to deny any impropriety by petitioner. All government agencies and most professionals have cleared the petitioner of any sexual misconduct toward his daughter.
>
> Respondent's failure to concede on these issues, failure to

---

[5]These obstructionist tactics include: refusal to cooperate with the GAL, refusal to allow visitation, and interference with court ordered visits between Mary Alice and James Crosetto, resulting in James bringing several contempt motions; attempts to avoid service; and threatening to take administrative action against Dr. Stuart Greenberg, (a psychologist ordered to conduct psychological examinations of the parties) if he did not testify favorably to her position. In addition, during one of James Crosetto's motions, a court commissioner acknowledged the obstructionist nature of Laurel Crosetto's conduct and stated, "there is a course of conduct engaged in by the mother in which if she is not outright flaunting court orders, she is doing indirectly what she cannot do directly," and noted that two previous commissioners had warned her regarding sanctions that would be imposed for further violations of court orders.

allow a resumption of unsupervised visitation, and fears of undue manipulation of the daughter, resulted in a court order changing temporary custody to the petitioner and requiring supervised visitation for the respondent.

Here, James Crosetto, without citing to the record or financial affidavit, claims that because of Laurel Crosetto's conduct, he incurred over $50,000 in attorney fees and expenses.[6] James Crosetto did not address the fee issue during the presentation of final papers, although he aggressively sought clarification of goodwill and the property division.

Aside from his claim that he incurred expenses of over $50,000 and that he would have spent "no more than perhaps $15,000" but for the alleged intransigence, James Crosetto provides no substantiation for this claim.[7] Because we remand for other proceedings, the trial court should also consider what attorney fees and costs were incurred as a result of Laurel Crosetto's intransigence. The fee award should be segregated, separating those fees incurred because of intransigence from those incurred by other reasons. *See In re Marriage of Sievers*, 78 Wn. App. 287, 312, 897 P.2d 388 (1995) (unnecessary to segregate fees incurred by reason of intransigence where husband's bad acts permeated entire proceedings).

### F. Attorney Fees on Appeal

Laurel Crosetto seeks attorney fees on appeal pursuant to RAP 14.1-14.6(c) and RCW 26.09.140. As of 10 days before oral argument, Laurel Crosetto had not submitted an affidavit of financial need as required by RAP 18.1(c). An appellate court will not consider an award of attorney fees on appeal under RAP 18.1 and

---

[6]James Crosetto testified he was seeking $52,000 in legal fees, $9000 of which were attributed to court costs. However, the trial court found his separate debts included attorney fees of at least $15,000.

[7]Although there may be varying reasons for retaining new counsel, we note that to date, Laurel Crosetto has employed at least 15 different attorneys. The frequency of these changes resulted in duplicative work and continuances and other delays.

RCW 26.09.140 when a party seeking fees fails to comply with RAP 18.1(c). *In re Marriage of Leland*, 69 Wn. App. 57, 76, 847 P.2d 518, *review denied*, 121 Wn.2d 1033 (1993).

Affirmed in part, reversed in part and remanded for proceedings consistent with the decision herein.

BRIDGEWATER and TURNER, JJ., concur.