FILED
COURT OF APPEALS
DIVISION II

2014 FEB -4 AM 9: 19

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | |
| CHAD MITCHELL BURTON, | No. 43997-2-II |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| DEBORAH RENEE BURTON, | |
| Appellant. | |

MAXA, J. – Deborah Burton appeals a decree of dissolution, property distribution, and parenting plan following the dissolution of her marriage to Chad Burton. She claims that the trial court erred in (1) not hearing testimony from a psychologist who evaluated the parties, (2) not including a provision in the decree allowing her to regain primary custody of her children, (3) making one-sided findings of fact negative to her, (4) not entering judgment for her share of the community property, (5) ordering maintenance for only six months, (6) incorrectly determining the separation date, and (7) not awarding attorney fees on the basis of need. We disagree and affirm.

FACTS

The Burtons married on July 12, 1997. In March 2009 Chad[1] moved out of the family home after a domestic violence incident. They had three children during their marriage, who were ages 7, 9 and 12 at the time of trial. Deborah did not work outside the home during their marriage. Chad was a partner in a financial planning firm, earning a net income of $10,000 per month.[2] He also co-owned the firm's business office building.

In January 2010, Chad filed a dissolution petition. On February 19, 2010, the trial court ordered the parties to have an evaluation to assess their mental health and their interaction with the children. Jeffrey Foster, a family therapist, spent a year evaluating the Burton family and concluded in his February 2011 report that Chad should have primary residential custody of the children and that Deborah should undergo psychological and chemical dependency evaluations and begin psychotherapy. He also recommended that Deborah's time with the children be professionally supervised for a minimum of 60 days.

In May 2011, Landon Poppleton, a clinical and forensic psychologist, conducted a bilateral custody evaluation of the Burton family. He described Chad and Deborah as engaged in "situational couple violence", which he defined as "a pattern of domestic conflict resulting from situations or arguments between partners that escalate on occasion into physical violence." Ex. 1 (Poppleton) at 2 (emphasis omitted). Poppleton also expressed concern for the children because of their exposure to and involvement in the parental conflict. He recommended that Deborah

---

[1] Because the parties in this case share the same last name, we refer to them by their first names. We intend no disrespect.

[2] Deborah argues, based on Chad's 2011 income tax return, that Chad's monthly income was $19,000. The trial court accepted Brad's $10,000 per month figure based on his 2012 income.

have primary residential custody. But in a follow-up evaluation to assess parental alienation and domestic violence issues, Poppleton recommended that Chad have primary residential custody and that Deborah get mental health treatment. He also recommended that Deborah could regain primary residential custody if she learned to manage her emotions and reactivity and to stop drawing the children into the conflict.

At trial, Chad presented Foster as a witness, introduced Foster's and Poppleton's reports, and testified on his own behalf. Deborah represented herself and testified on her own behalf, but did not call any other witnesses.

The trial court awarded Chad primary residential custody. It also awarded Deborah $4,500 per month for 38 months as a property award (representing one-half of the value of Chad's business and office building) and $1,000 per month for 6 months of maintenance beginning in June 2012. The trial court did not award fees or costs to either party.

## ANALYSIS

### A. STANDARD OF REVIEW

Trial court decisions in dissolution proceedings will seldom be changed on appeal. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). We review such decisions for manifest abuse of discretion. *In re Marriage of Cota*, ___ Wn. App. ___, 312 P.3d 695, 699 (2013). " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)).

B.    EVALUATOR'S TESTIMONY AT TRIAL

Deborah argues that the trial court erred in not allowing Poppleton to testify. She claims that he was the more qualified witness and had worked extensively with the family, and that she wanted him to testify. She argues that the trial court applied two improper rationales: (1) the trial court was too busy and (2) Deborah could not afford to pay Poppleton. She characterizes the trial court's decision as a "bait-and-switch" in that it first told her that she could call Poppleton but then refused. Br. of Appellant at at 9-10.

However, the trial court never ruled that Poppleton could not testify. The trial court told Deborah the first day of trial that if she wanted him to testify, she would have to get him to come to court. RP 32. She responded, "That would be very easy to do." Report of Proceedings (RP) at 32. That afternoon, Deborah asked the trial court if she could call Poppleton to testify the next day. The trial court responded, "[N]o, because I've got other things going on tomorrow. If you call Dr. Poppleton, you would probably have to pay Dr. Poppleton to show up. . . . [H]e'd probably charge you for that." RP at 155. After the trial court informed Deborah that Chad was not going to call Poppleton and would only rely on Poppleton's reports, it told Deborah, "If you want to bring in Dr. Poppleton . . . then you'd have to contact him, probably you'd have to pay him. . . . And you'd have to get him here." RP at 190.

In none of these interactions did the trial court refuse to hear testimony from Poppleton. Instead, the trial court was explaining to Deborah, who was acting pro se, what she needed to do if she wanted Poppleton's testimony. Further, Deborah fails to identify what information Poppleton would provide that was not available in his reports. The trial court did not refuse Poppleton's testimony and did not deny Deborah a fair trial.

4

C.     PARENTING PLAN

    1.    Child Custody

Deborah argues that the trial court erred in not including a provision in the parenting plan that would allow her to regain primary custody of the children. She argues that both parent evaluators made such a recommendation and the trial court indicated in its oral ruling that custody might revert back to the wife under certain conditions, but that the trial court abused its discretion in omitting it from the final parenting plan.

The trial court has broad discretion in formulating a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). We will not reverse unless the decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Kovacs*, 121 Wn.2d 795, 801 & n.10, 854 P.2d 629 (1993). The trial court's primary concern in establishing parenting plans is to serve the best interests of the children. RCW 26.09.002.

Here, the trial court followed the experts' recommendation, giving Chad primary residential custody. The trial court had no obligation to adopt all of the evaluators' recommendations and provide a pathway that would allow Deborah to regain primary custody. *See In re Custody of Brown,* 153 Wn.2d 646, 655 n.5, 105 P.3d 991 (2005) (trial court should consider evaluator's report but is not bound by it). Further, a trial court is not required to include oral rulings in its final, written order. *See DGHI Enters. v. Pac. Cities, Inc.*, 137 Wn.2d 933, 944, 977 P.2d 1231 (1999). The trial court did not abuse its discretion.

    2.    Findings of Fact

Deborah argues that the record does not support the trial court's findings of fact under the parenting plan and that this court should strike those findings as one-dimensional in favor of Chad and against Deborah. She cites three findings as unsupported by the record and complains

that the findings have an "un-judicial" tone. Br. of Appellant at 15. These findings are that Deborah "sent thousands of texts bashing Mr. Burton," that Deborah's fourth child's father had inappropriate behavior with clients, and that Deborah stole the babysitter's cell phone to send "ugly" text messages to Chad. Clerks Papers (CP) at 21, 22.

By limiting her argument to only these three findings, Deborah waives her challenge to the remaining findings. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 689 n.4, 974 P.2d 836 (1999). And because those remaining findings support the trial court's placement decision, we find no error. We do note, however, that the record shows that Deborah sent innumerable text messages to Chad ("this went on for now almost three years.") RP at 75. Foster described the number of messages as "voluminous." Ex. 1 (Foster) at 5. And there was evidence supporting portions of those other two findings as well. More importantly, the remaining findings to which Deborah did not object and the evaluators' recommendations support awarding primary residential custody to Chad.

To the extent Deborah seeks to have the findings struck because of her allegation that the tone was inappropriate or the language was unprofessional, we deny her request. Even if we agreed with her allegations, we know of no authority that would support having this court remand for the trial court to make its findings more "judicial."

D.    PROPERTY DISTRIBUTION

1.    Monetary Judgment

Deborah argues that the trial court erred in failing to enter a judgment against Chad rather than entering an order regarding community property. She claims that the division of property should have included a promissory installment note and simply attaching an amortization schedule to the decree was insufficiently enforceable. Chad argues that Deborah cannot make

6

this claim on appeal as she failed to make it below at trial or in her motion for reconsideration. He also argues that the decree is indeed enforceable as nothing would prevent Deborah from enforcing the decree in superior court.

We agree with both of Chad's propositions. Deborah neither sought a judgment at trial nor sought one while represented by counsel on her motion for reconsideration. *In re Marriage of Studebaker*, 36 Wn. App. 815, 818, 677 P.2d 789 (1984). Further, the decree is enforceable. *See In re Marriage of Crossland*, 49 Wn. App. 874, 877, 746 P.2d 842 (1987) (court of equity has power to decree as well as to enforce that decree).

2. Maintenance

Deborah argues that the trial court erred in its maintenance award in that it (1) considered future property payments when determining future maintenance payments and (2) equated past family support payments with past maintenance. Without citing authority, she argues that the trial court should have awarded $2000 to $4000 – or even $8000 based on Chad's higher income – in maintenance for thirty months beginning after trial because "the rule of thumb for calculating maintenance is one year of maintenance for every four years of marriage." Br. of Appellant at 17. She further argues that the trial court improperly counted the property award as maintenance when it should not have. *See In re Marriage of Stenshoel*, 72 Wn. App. 800, 805, 866 P.2d 635 (1993) (court improperly included property distribution as income in determining the child support obligation).

In setting maintenance, the trial court reasoned:

> He was paying an average of a little over $2,000/month for maintenance, and my rationale was that he should pay six more months at $1,000 a month and that would take care of any maintenance award.
> In addition to that, I again accept his proposal that he be paying $4,500 until the asset's paid off.

RP at 308. In its written findings, the trial court considered Deborah's property payment in explaining the amount and duration of maintenance:

> Although the wife did not make a specific request for maintenance or provide any specific testimony on that issue, she did provide a budget with stated expenses of $5,470.00. She claimed a desire to go back to school but provide[d] no details as to when she will start, when she will finish, where she will go and the cost. Nevertheless, she was not employed at the time of the trial. The wife will be receiving the sum of $4,500 per month for 38 months as a property award so an award of $1,000 per month maintenance for a period of six months from June, 2012 will provide her with sufficient funds for that period of time. Additionally, the husband did not request child support so she will not have to make a child support transfer payment.
>
> . . . .
>
> The wife did not present specific evidence about a desired education or training plan. Nevertheless she has been out of the work force for some time and will need some time to reintegrate herself into the work force and the court finds that six months of maintenance at $1,000 per month should be sufficient, combined with the $4,500 per month she will receive for 38 months. When six months expires and the $1,000 terminates, she will still have 32 months left of the $4,500 per month payments.

CP at 16.

Deborah argues that these findings demonstrate that the trial court improperly considered her property payment as income. We disagree. We review a spousal maintenance award for an abuse of discretion. *In re Marriage of Luckey*, 73 Wn. App. 201, 209-10, 868 P.2d 189 (1994). The trial court sets the amount and duration of maintenance by applying the factors in RCW 26.09.090(1) to determine if the amount is "just."[3] *Luckey*, 73 Wn. App. at 209. The trial court's findings show that it thoroughly considered these statutory factors.

---

[3] Those factors are:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

Chad testified that he provided Deborah with $54,641 between June 2011 and May 2012 (approximately $4,900 per month). Until January 2012, he had provided her $2,000 per month and paid for all bills other than her cell phone and groceries. Beginning in February 2012, he paid her $4,500 per month. Clearly, Chad paid more than the child support schedule in RCW 26.19.020 required at that time ($2,760). The trial court acted within its discretion in considering these past payments, at least those exceeding the child support schedule, to be maintenance.

We also find no abuse of discretion in the amount of maintenance the trial court awarded to Deborah. Chad assumed all community debt, took on complete financial responsibility for the children, and had to make an equalizing payment of $4,500 per month for 38 months. The trial court's intention, as noted in finding 2.12, was to give Deborah enough time to start a career and it deemed six months as sufficient. Finally, the trial court, in setting a maintenance amount, was required to consider the "financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently." RCW 26.09.090(1)(a); *In re Marriage of Crosetto*, 82 Wn. App. 545, 559, 918 P.2d 954 (1996) (trial court can consider property division when awarding maintenance). The

---

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
(c) The standard of living established during the marriage or domestic partnership;
(d) The duration of the marriage or domestic partnership;
(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.
RCW 26.09.090.

trial court considered each of the statutory factors in setting the amount and duration of maintenance. We find no error.

### 3. Separation Date

Deborah argues that the trial court erred in finding that their separation date was March 12, 2009, and in suggesting to her that this date benefitted her. She claims that she and Chad were not separated then because they continued to have sexual relations, had personal possessions in each other's residences, spent weekend vacations together, attended social events together, and attempted reconciliation. Instead, she argues that they did not separate until January 22, 2010, when Chad filed the petition for dissolution.

The trial court determines the separation date based on the peculiar facts of each case. *In re Marriage of Nuss*, 65 Wn. App. 334, 344, 828 P.2d 627 (1992). " 'The test is whether the parties by their conduct have exhibited a decision to renounce the community, with no intention of ever resuming the marital relationship.' '" *Nuss*, 65 Wn. App. at 344 (quoting *Oil Heat Co. v. Sweeney*, 26 Wn. App. 351, 354, 613 P.2d 169 (1980)).

The trial court found that the parties separated on March 12, 2009. We review this finding of fact for substantial evidence. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). March 12, 2009, was the day the police arrested Chad for domestic violence and removed him from the home. It is undisputed that they were both having affairs. Deborah's began in August 2008 and she eventually had a child because of that relationship. Chad's affair began sometime after March 2009 and continued even through the period of attempted reconciliation. And in December 2009, the parties had mutual restraining orders in place. Substantial evidence supports the trial court's finding of fact on the date of separation.

E.    ATTORNEY FEES

1.    Superior Court Fees

Deborah argues that the trial court erred in refusing her request for attorney fees below. She argues that the trial court should have considered her inability to pay attorney fees and that the $4,500 monthly payment from Chad was only enough to cover her basic needs, not pay for an attorney. She argues that since the $4,500 was later counted as a property payment, she had no income and thus clearly had the need. By contrast, she argues, Chad had a steady income, outspent her four to one for representation, and had the ability to pay.

The trial court explained to Deborah that she could request attorney fees. It also discussed the amount of money she had borrowed from her father to pay her legal fees. Yet she never made a formal request that the trial court award her fees. As such, we have nothing to review. But we do note that the trial court would have acted within its discretion had it denied a fee award in that it allocated all community debt to Chad, awarded Chad primary residential custody of the children, required Chad to pay one-half his net income as an equalizing payment, and did not require Deborah to pay child support.

2.    Appeal Fees

Deborah requests attorney fees on appeal because her monthly expenses are $4,700 and she has no income. Further, she cannot afford the fees for this appeal, needs to go back to school, and needs to defend herself in a separate lawsuit Chad is pursuing against her.

In determining whether to award attorney fees on appeal, we examine the arguable merit of the issues raised and the parties' financial resources. *Luckey*, 73 Wn. App. 210. Having done so, we deny her request.

11

No. 43997-2-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
PENOYAR, J.

_____
LEE, J.

12