# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of<br><br>LAWRENCE L'HOMMEDIEU,<br><br>Respondent,<br><br>And<br><br>SHELANE L'HOMMEDIEU,<br><br>Appellant. | No. 53639-1-II<br>(consolidated with No. 54702-3-II)<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J. – Shelane L'Hommedieu[1] appeals from the trial court orders addressing the division of property and spousal maintenance in the dissolution action brought by her former husband Lawrence L'Hommedieu. Shelane[2] also appeals from the trial court's denial of her various motions for reconsideration. She argues that the trial court erred when it (1) characterized Lawrence's Oregon PERS[3] income as his separate disability income, (2) failed to address her community interest in various assets that Lawrence took or liquidated before the current dissolution action was filed, (3) precluded her from introducing evidence or questioning Lawrence

---

[1] Shelane is a self-represented party.

[2] Because Shelane and Lawrence share the same last name, we refer to them by their first names to avoid confusion.

[3] Public Employees Retirement System.

about missing assets, (4) failed to address her community property interest in the River Glen Road property and concluded that Lawrence had not acted in bad faith when he deeded the property to his father, (5) failed to distribute all of the parties' vehicles and unequally distributed the vehicles it did address, (6) failed to find that Lawrence acted in bad faith when he removed her as the survivor beneficiary of the Oregon PERS pension, (7) refused to rule on Lawrence's violation of the temporary orders regarding the family health insurance and failed to order Lawrence to pay her additional health care costs, (8) failed to consider all relevant factors, including each parties' resources, when awarding spousal maintenance, (9) failed to resolve unpaid child support issues, (10) set the temporary child support lower than the amount in the economic table and child support worksheets without explanation, (11) restricted her access to her portion of the PERS individual account program (IAP)[4] account until Lawrence turns 55 years old and limited her access to the account records, (12) assigned various debts to her, and (13) referred to allegations of opiate abuse in a clarification order. Shelane also request costs.

Because of the disparity in income between the parties, despite Lawrence's ability to pay, we hold that the trial court abused its discretion when it set Shelane's spousal maintenance at $1,500 a month for three years. Accordingly, we remand this matter for the trial court to determine the spousal maintenance. We otherwise affirm. Because Shelane has not filed the required financial affidavit, we deny Shelane's request for costs.

---

[4] " 'Individual account program' means the defined contribution individual account program of the Oregon Public Service Retirement Plan established under ORS 238A.025." ORS 238A.005(9) (ORS 238A.005 was amended in 2021. *See* 2021 Or. Laws ch. 135, § 3 [, at ___]. Because the amendment does not impact our analysis, we cite to the current version of the statute.).

Consolidated Nos. 53639-1-II / 54702-3-II

FACTS

I. BACKGROUND

Starting in 1996, Lawrence began working for the Tualatin Valley Fire & Rescue in Oregon. Shelane and Lawrence were married on April 29, 1998. The couple had two girls, who were born in November 1998 and August 2002.

Lawrence became disabled in 2010, after 14 years of service with the fire department. In 2011, his application for a PERS "disability retirement allowance" based on "a duty-related disability" was approved. Tr. of Excepts of Test. from Audio Files (Tr.) (May 24, 2019) at 21. At the time of trial, Lawrence was receiving $6,269 a month from his PERS disability. He also qualified for social security disability in the amount of $2,660 a month, and for veteran's disability in the amount of $3,458.07 a month.

The marital community ended on September 1, 2013. Lawrence filed for dissolution in July 2014.

In December 2015, the trial court issued temporary orders requiring Lawrence to pay Shelane $3,000 a month in spousal maintenance and $1,500 a month in child support.[5] These orders also restrained Lawrence from "assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life or auto insurance." Clerk's Papers (CP) (Oct. 1, 2019) at 3. They further required Lawrence to pay the health insurance premiums for the children and to notify Shelane when the coverage terminated.

---

[5] The standard child support calculation was stated as $2,524 per month.

3

## II. TRIAL

The case went to trial in May 2019. At trial, Lawrence called his mother, himself, and Shelane as witnesses. Shelane, acting pro se, called herself as a witness. And Lawrence called himself as a rebuttal witness.

Shelane has not supplied this court the complete transcript from the two-day trial. Instead, she has supplied selected portions of the record. The transcribed portions of the verbatim report of proceedings show numerous short gaps throughout and completely omits (1) Shelane's testimony as Lawrence's witness, which lasted just over an hour and (2) Lawrence's rebuttal testimony, which lasted approximately 36 minutes.

### A. LAWRENCE'S WITNESSES

#### 1. LAWRENCE'S MOTHER'S TESTIMONY

Lawrence's mother testified about a property (the River Glen Road property) that Lawrence and Shelane had purchased with Lawrence's father during the marriage. Lawrence's mother testified that the property was purchased for $250,000 and that she and her husband used $200,000 of their line of credit on their home to finance the purchase for Lawrence and Shelane. At some point Lawrence quitclaimed the property to his father, but Lawrence continued to pay them back to cover the interest payments on the line of credit that financed the property. She also testified that the property was sold for $179,000 "a few months" before the trial. Tr. (May 24, 2019) at 16.

#### 2. LAWRENCE'S TESTIMONY

Lawrence testified about his injury, his disability, his other disability benefits, and his "PERS disability determination" as described above. *Id.* at 20. He testified that his PERS

"application for disability retirement allowance was approved for a duty-related disability" in 2011, and that his disability status was reexamined almost yearly. *Id.* at 21.

Lawrence also testified that he and Shelane had initially separated in March 2012, when Shelane left the family home with their children while he was away. He testified that after discovering that Shelane had left, he found that she had taken all of their gold and silver with her. Shelane filed for dissolution in April 2012, but they reconciled in June 2012. They separated again on September 1, 2013, and he filed this dissolution action in 2014.

In regard to the River Glen Road property, Lawrence testified that he purchased the property with his father and that his father had provided $200,000 of the purchase price and he (Lawrence) provided $50,000 towards the purchase. He had initially purchased the property to put his and Shelane's home's septic system on the lot, but they did not have to do so. Lawrence stated that his father was involved simply to help him (Lawrence) and Shelane, and that the agreement was that the purchase of the land "wouldn't cost [his father] any money." *Id.* at 35. Lawrence testified that his father no longer owned the land.

On cross-examination, Shelane presented Lawrence with evidence that he had purchased the property for $200,000, not $250,000, but Lawrence asserted that there was "a mistake" on the sales history and the deed that had since been corrected. *Id.* at 44. Also on cross-examination, Lawrence testified that he had quitclaimed the deed for the property to his father when "EPG"[6] filed a lien on the property and that EPG later filed a claim against him and his father under the fraudulent transfer act. *Id.* at 55.

---

[6] EPG appears to be an investment company; there is no detail regarding EPG's action against Lawrence in the record beyond the fact it existed and there was a judgment against Lawrence.

In regard to health insurance, Lawrence testified that he had Blue Cross health insurance coverage for his family when the temporary orders were filed. But he stopped paying the insurance premiums around July 2016, when he was struggling with his mental health and had been "admitted to a mental hospital." *Id.* at 60-61. After leaving the hospital, he was "assigned a fiduciary to assist [him] with" the dissolution and help him pay his bills. *Id.* at 61. Lawrence testified that he had previously entrusted $22,000 to someone who had "ripped [him] off" and part of the fiduciary's role was to make sure he handled his money appropriately. *Id.*

Lawrence also testified that the family home was foreclosed on around the time the current dissolution was filed. When asked what property was left, Lawrence testified that there was just their personal property and some vehicles. He identified the vehicles as collectable Plymouth 'Cuda with an estimated value of between $35,000 and $50,000;[7] a motorcycle valued at $3,000; a Chevy Nova valued at $3,000 to $5,000; a Subaru; and a "VersaClimber." *Id.* at 38.

Regarding child support, Lawrence testified that he had been paying $919 in child support and that Social Security sent that money to Shelane. He believed that the social security payment was a garnishment. He denied having taken social security child benefits that were supposed to go to their daughters.

Lawrence admitted that he had "cash[ed] in some accounts in order to prevent [Shelane] [from] . . . attempting to take them, just like she did with our gold and silver." *Id.* at 81. But he testified that he did not cash in these accounts "with the intent to keep it from [Shelane]" or "hide any assets from Shelane." *Id.* at 81-82.

---

[7] Lawrence testified that he had purchased 1500 ounces of silver at some point after he and Shelane had initially reconciled, but he asserted that he traded this silver for the Plymouth 'Cuda.

6

B. SHELANE'S WITNESSES

The only witness in Shelane's case in chief was Shelane.

Shelane asserted that Lawrence had tricked her into signing documents that removed her as the "survivor beneficiary on the pension account." *Id.* at 87. She also presented evidence that there had been substantial withdrawals from joint investment accounts between 2010 and 2013, which she asserted demonstrated that Lawrence had been draining these accounts in an attempt to hide these assets. While presenting numerous exhibits in support of this argument, the trial court asked Shelane "[i]f there's a way to speed it up" because they were running out of time. *Id.* at 103.

Shelane also asserted that the property transfer between Lawrence and his father was fraudulent and that Lawrence was the one who took the gold and silver that went missing when she left the home in 2012.[8] Additionally, Shelane asserted that Lawrence had been receiving social security child benefits that were intended for their children and that he did not provide her with those benefits even though the children were living with her. She stated that Lawrence had only paid the court ordered child support "out of his own pocket" for six months. *Id.* at 136.

She further testified that Lawrence had violated the temporary orders by letting the family's health insurance lapse, which caused her to incur substantial medical debt when she suffered a "ministroke" in December 2016 and required her to purchase her own health insurance and cover additional medical expenses. *Id.* at 140. She stated that she did not believe Lawrence's testimony that he had let the insurance lapse due to mental health issues because he had previously moved to cancel the insurance and that motion had been denied.

---

[8] She valued the gold and silver at $51,000.

Shelane testified that her stroke was disabling, but she did not qualify for social security disability benefits because she had not worked enough. She also questioned whether Lawrence was actually disabled based on "things that [she had] seen during the marriage and people that he knows" who were also faking disabilities. Tr. (May 28, 2019) at 7.

III. TRIAL COURT ORDERS, MOTION FOR CLARIFICATION, MOTIONS FOR RECONSIDERATION

On July 9, 2019, the trial court entered the following findings of fact and conclusions of law:

**Specific Findings of Fact**

1. [Lawrence] has been found to be disabled by State of Oregon, the Social Security Administration and Veteran's Administration. [Shelane] did not present sufficient compelling testimony or evidence to disturb the conclusions of these governmental entities regarding [Lawrence's] disability status.

. . . .

3. [Shelane's] performance in representing herself in this complicated dissolution action involving multiple days of testimony, hundreds of exhibits and examination and cross-examination of witnesses somewhat undermines her argument that she is not employable due to cognitive disabilities. At the same time, her performance in this litigation does not establish conclusively that she is immediately employable or that a job she could obtain would provide her with a standard of living commensurate with the financial position [Lawrence] will occupy post-dissolution.

. . . .

5. I am not persuaded by the evidence submitted on this record that [Lawrence] engaged in fraud in connection with the selection of beneficiaries for his Oregon PERS account.

6. I am not persuaded by the evidence on this record that [Lawrence] fraudulently or falsely appropriated Social Security benefits for himself that were allegedly due to the parties' children.

7. I am not persuaded by the evidence on this record that [Lawrence] improperly failed to pay any support (child or spousal) that he was court-ordered to

8

pay during the parties' separation. Indeed, although [Shelane] alleges a deficit exists with regard to payments she and the children did not receive for "years" she concedes that this amount is unknown and she is "unable to calculate" it.

8. I find that the property in Skamania County on River Glen Road was purchased by [Lawrence] and his father in or around 2006 for approximately $250,000. This real property was then subsequently sold in 2018 for approximately $179,000. [Lawrence] is currently making monthly payments to his parents to repay for the investment they made in this property. The substantial evidence on the record established that the sale of this property did not provide any profit that would be subject to division in this action.

9. There is not sufficient evidence on this record that the money in the parties' bank accounts at separation and the silver and gold assets that [Shelane] claims are subject to division are actually assets that are available for distribution. Similarly, there is not sufficient evidence on this record to conclude precisely what became of these assets or that either party is entitled to an offsetting judgment in this matter to account for these unavailable assets. For instance, without persuasive proof, both parties have charged the other with secreting the silver and gold assets at or around the time of separation. Neither party has presented sufficient evidence on this issue for the court to make a conclusive finding of fact one way or another regarding these items.

10. [Lawrence] worked for Tualatin Valley Fire & Rescue from 1996-2010. [Lawrence] suffered a job-related injury on May 8, 2010. [Lawrence] separated from this employer with a disability retirement as of February 28, 2011.

## Child Support

1. [Lawrence's] income is comprised of benefit payments he receives from U.S. Veterans Administration, Social Security Disability, and Oregon [PERS]. Currently, these payments to petitioner total approximately $12,387.00 per month. Given [Lawrence's] recent determination that some of these assets may be subject to taxation the current payment amount may be slightly different going forward. . . .

2. [Shelane] asserts that she has not been employed for a lengthy period of time and that she does not possess the requisite skills, training or experience to obtain a job of any kind. [Lawrence] counters these arguments by claiming that [Shelane] has not attempted to find work and that she outwardly appears competent to hold a job. In partial support of this position, [Lawrence] claims that the work that [Shelane] did in representing herself in this matter is proof that she can be gainfully employed in the current work force. While there is some appeal to this logic, it ignores the broader reality regarding [Shelane's] physical condition, age,

9

lack of work history, limited education and job skills. That said, [Shelane] marshalled a substantial amount of evidence in this case, conducted a deposition of [Lawrence] and conducted examinations and cross-examinations of witnesses over two days of testimony in a competent and thorough manner. Despite her statements that she is not able to process information quickly, her examinations and legal argument at trial partially belie her assertions that she is unable to work at anything because of cognitive and processing limitations. Furthermore, while [Shelane] presented testimony concerning her lack of job experience and current medical challenges, there was not a substantial amount of authoritative evidence in the record on this issue. Consequently, I will hold [Shelane] to contribute simply the minimum amount to child support of $50.00 per month for purposes of calculating the proper amount owed by [Lawrence], and not impute a minimum-wage income to her at this time.

3. [Lawrence] shall be obligated to pay child support until the parties' youngest daughter reaches 18 years of age. . . .

### Spousal Maintenance

1. In every dissolution action where the issue of spousal maintenance is presented the court is obligated by statute to consider several factors in deciding how much, if any, support should be ordered. The factors include: the financial resources of the party seeking maintenance; the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; the standard of living established during the marriage; the duration of the marriage; the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; and the ability of the obligated spouse to meet his or her needs and financial obligations while meeting those of the spouse seeking maintenance.

2. In the present matter, [Shelane] has limited financial resources and has needed the temporary maintenance she has received to meet her regular expenses. It is uncertain what time would be necessary for [Shelane] to complete training or education to enable her to be self-sufficient. Indeed, [Shelane] seems to indicate that she will never be able to obtain employment of any kind given her health issues, lack of skills, age and lack of job experience. As for the parties' standard of living during marriage, it appears that they were comfortable. This marriage lasted 15 years before the most recent separation in 2013, and there has obviously been a lengthy period of separation. [Shelane] has not provided any information regarding efforts, if any, she has undertaken to obtain self-sufficiency since separation. At the same time, it is undisputed that for much of this time, [Shelane] was responsible for raising the parties' children including home schooling. Nevertheless, the testimony presented at trial established that [Shelane's] home schooling duties are effectively complete or nearly so. Therefore, [Shelane] will be largely freed from these

responsibilities to pursue employment. [Shelane] has alleged that her age and physical limitations make it difficult for her to meet her basic financial needs while [Lawrence] has relatively little difficulty meeting his own regular and recurring financial obligations.

3. [Lawrence], for his part, claims that spousal maintenance is inappropriate here because: he has paid a significant amount of support to date; [Shelane] has not satisfied her obligation to become self-sufficient; and any award of spousal maintenance should not extend beyond [their youngest daughter's] graduation from high school or 18th birthday, whichever first occurs. [Shelane's] request for maintenance is less easily summarized, but appears to seek one-half of [Lawrence's] monthly payments from Oregon PERS presumably as long as it is paid to [Lawrence]; $130 per month to apply toward a life insurance policy on [Lawrence] in favor of [Shelane]; and $1,622.49 per month payments for 14 years. In arriving at these numbers, [Shelane] appears to conflate property settlement issues and spousal maintenance under the rubric of "alimony." While it is certainly proper for a court to consider a spousal maintenance award in the overall context of the property and/or child support awards in order to achieve a fair financial result for the parties, it is also important that the court differentiate between these items in issuing its decision so there is no misunderstanding regarding the actual terms of the court's award and judgment. [Shelane's] request for three separate "alimony" awards risks creating this confusion and the court will decline to adopt this approach to the ruling herein.

4. [Lawrence] contends that he has paid a substantial amount of spousal maintenance to [Shelane] already due to the temporary order requirement that he pay $3,000.00 per month in spousal support since November of 2015. His argument is that this is sufficient amount of support given the duration of the marriage and the position of the parties. This is not, however, the full scope of considerations that the court will examine in making this decision. Indeed, an important consideration for the court is the relative financial positions of the parties and the financial prospects that they will each face going forward. Here, [Lawrence] is in much better financial situation than [Shelane] and that is likely to be the case for the foreseeable future. So, while a permanent award of maintenance is rare in Washington, there are circumstances where a just result may require spousal maintenance to continue for a period of time where, as is the case here, [Lawrence] will have a much greater post-dissolution income than [Shelane], and [Shelane] faces significant barriers to becoming self-sufficient (health, age, job experience, etc.). Specifically, if no changes were made, [Lawrence] will receive approximately $12,387.00 per month from his various disability payments post-dissolution, while [Shelane] does not have a recent job history that would provide her with a monthly salary even close to that amount. In this setting, our state's appellate courts have held that the maintenance can occasionally be properly utilized as a "flexible tool by which the

parties' standard of living may be equalized for an appropriate period of time." *See,* [*In re Marriage of Washburn*, 101 Wn.2d 168, 179 677 P.2d 152 (1984)].

5. I find that [Lawrence] will have sufficient assets post dissolution to maintain a standard of living that relatively comports with the manner in which he lived during marriage even while paying maintenance to [Shelane]. [Shelane], on the other hand, has a limited potential to achieve this standard of living even with a maintenance payment from [Lawrence]. So, while it is not necessarily the court's duty to equalize the parties' post-dissolution financial situations, the relative financial circumstances of the parties can be part of the calculations in setting a maintenance award. Taking all these factors into consideration I am persuaded that a fair and equitable result in this case is for [Lawrence] to pay [Shelane] spousal maintenance of $1,500 per month for three years. This award takes into account my findings that there will be a disparity in the relative financial positions of the parties post-dissolution without this order of maintenance and that [Shelane] presented sufficient evidence to show that she will have a difficult time obtaining gainful employment given her lack of experience and medical problems. Contrary to [Lawrence's] assertions, I do not find [Shelane's] claims regarding her medical problems and lack of recent or extensive job experience to be "unsubstantiated" . . . or the product of a "ruse" tied to the home schooling of the parties' children. That said, I am persuaded that [Shelane's] role in home schooling will not prevent her from getting a job. In addition, her testimony that she is unable to "keep up" in a modern workforce given her physical limitations and lack of experience may make [Shelane's] transition back to employment difficult, but not impossible. The maintenance provided herein is designed to assist her in making this transition.

## Property Division

1. The major dispute with regard to property division in this matter is whether or not the payments [Lawrence] receives for his disabilities are subject to division. Not surprisingly, both parties contend that this issue is easily resolvable in their respective favor without acknowledging that Washington's appellate courts have long struggled with finding such precise characterizations of these sorts of assets. The linch pin of this question centers on whether or not the disability payments are intended to serve as a replacement of future compensation or are more akin to retirement benefits or deferred compensation. The former type of asset is typically not distributable while the latter is more properly subject to division. A hybrid situation exists where the payments are not clearly denominated or classified as either retirement benefits or disability benefits. Predictably, the appellate courts have struggled with these issues and in some cases sent differing signals to trial courts on how to proceed.

2. In examining the benefits that [Lawrence] currently receives, it is not entirely clear in each instance whether or not they are more like retirement benefits

12

or disability benefits. While [Shelane] concedes that [Lawrence's] military disability income is not subject to division, she asserts that the entirety of the benefits he receives from Oregon PERS should be subject to division. One of [Shelane's] stated reasons for this division is her claim that [Lawrence] is receiving more in compensation from disability benefits than he did while he was employed. While this is not a proper basis on its own for dividing the assets, there is a more apposite rationale for examining these PERS assets and their possible division. In addition, it is clear from appellate court precedent that this question of a benefit's divisibility is not resolved simply by the label that is attached to it. Finally, it is well-settled that the characterization of property as community or separate is not controlling in division of property between the parties, but " [']the court must have in mind the correct character and status of the property . . . before any theory of division is ordered.['] " [*In re Marriage of Brewer*, 137 Wn.2d 756, 766, 976 P.2d 102 (1999) (second alteration in original) (quoting *Blood v. Blood*, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966)).]

3. Here, [Lawrence's] benefits from Oregon PERS are a form of hybrid benefits that were made available to him due to his disability, but also are a form of retirement benefit. With regard to the IAP account [Lawrence] has through PERS, this asset has not been distributed to [Lawrence] and has been accumulating value separate from any effort of [Lawrence] after he ceased making contributions to the principal from his paychecks. As such, this asset more closely resembles a retirement account that is properly considered a community asset subject to division. Consequently, I find that [Shelane] shall be entitled to receive 43% of [Lawrence's] IAP account on the accrual of this benefit during the parties' twelve years of marriage during [Lawrence's] 14 year career with Tualatin Valley Fire & Rescue. . . .

4. With regard to [Lawrence's] remaining PERS income, it is clear that the payments he has received and will receive until age 55 represent payment for income not received due to his disability and this asset is his separate property not subject to division. However, the payments due to him after retirement age would be properly considered a community asset subject to division according to the Washington appellate courts that have addressed this issue. Although most of [Lawrence's] career as a firefighter in Oregon occurred during marriage, there was a period of time prior to marriage where he was working for Tualatin Valley Fire & Rescue and accruing these benefits. Consequently, I find that [Shelane] shall be entitled to 43% of the pension retirement benefits [Lawrence] is entitled to receive commencing with his retirement eligibility at 55 years of age.

5. With regard to the remaining property assets, each party is to retain the property they currently possess as their own -- free from any claim from the other party. Specifically, [Lawrence] shall retain the Cuda automobile, and [Shelane] shall keep the Mazda 3 vehicle she currently possesses. Each party has an

independent obligation to execute documents necessary to release any interest they may possess in the property held by the other party. Failure to provide the other party with the necessary releases and conveyance documents to transfer these items of property may expose the recalcitrant party to contempt sanctions.

6. In arriving at this award, I have determined what I believe is fair, just and equitable under all of the circumstances, and while I have taken into consideration the character of the assets that are subject to division here, I have also exercised my discretion to achieve a property division that, in conjunction with the other aspects of this order, presents an equitable division of the parties' assets.

CP (Oct. 1, 2019) at 128-34.

On September 23, 2019, Lawrence moved for "clarification" of the trial court's July 9, 2019 order. CP (Aug. 14, 2020) at 1. On April 15, 2020, the trial court issued an order on Lawrence's motion for clarification. In this clarification, the trial court mentioned that it had considered Lawrence's allegations that Shelane was an opiate user when determining Shelane's employability and that no clarification was needed regarding this issue.

Also on April 15, 2020, the trial court entered its "[f]indings and [c]onclusions," which incorporated the July 9, 2019 order and the April 15, 2020 clarification order by reference, and a final divorce order. *Id.* at 70. The April 15, 2020 findings and conclusions included two exhibits, Exhibit H and Exhibit W, which described what assets and debts were awarded to Lawrence and to Shelane respectively.[9]

Shelane filed several motions for reconsideration, each addressing a separate set of issues. The trial court denied the motions for reconsideration.

---

[9] The trial court also entered a final child support order directing a transfer payment from Lawrence for the support of the remaining minor child in the amount of $1,383, starting on March 1, 2020. This support was to continue until the child turned 18, which occurred in August 2020.

14

ANALYSIS

I. OREGON PERS DISABILITY

Shelane first argues that the trial court erred in characterizing the disability portion of Lawrence's Oregon PERS "retirement pension" as his separate property. Br. of Appellant (No. 53639-1-II) at 11. Shelane asserts that (1) because the PERS account was an asset acquired during the marriage, the trial court should have characterized it as community property, and (2) there was no evidence that the disability payment was "anything other than a retirement pension" and the trial court's own findings demonstrate that the benefits were not entirely disability payments. *Id.* at 15. We disagree.

As part of making a just and equitable distribution of property in a marriage dissolution action, the trial court is required to determine whether the property before it is community or separate property. *In re Marriage of Groves*, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019), *review denied*, 195 Wn.2d 1005 (2020). We review a trial court's characterization of property as community or separate de novo, but we review the findings of fact on which that characterization was based for substantial evidence. *Id.*; *In re Marriage of Skarbek*, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). Unchallenged findings of fact are verities on appeal. *Brewer*, 137 Wn.2d at 766.

Shelane is correct that the trial court recognized that, as a whole, the Oregon PERS benefits were mixed disability and retirement benefits. That premise is demonstrated by the court's conclusion that "[Lawrence's] benefits from Oregon PERS are a form of hybrid benefits that were made available to him due to his disability, but also are a form of retirement benefit." CP (Oct. 1, 2019) at 133.

15

But the trial court also concluded that the PERS benefits Lawrence was currently receiving were in the form of disability benefits, stating that "[w]ith regard to [Lawrence's non-IAP account] PERS income, it is clear that the payments he has received and will receive until age 55 represent payment for income not received due to his disability." *Id.* So, even though the PERS benefits as a whole represented hybrid benefits, the trial court concluded that the benefit payments Lawrence was currently receiving were disability benefits and, thus, his separate property.

Under Washington law "disability benefits that are intended to be compensation for lost future earnings are not distributable upon dissolution." *Groves*, 10 Wn. App. 2d at 259. And, based on the record before us, the evidence supports the trial court's conclusion that the PERS income Lawrence was receiving was based on his disability. For instance, not only was Lawrence also receiving disability income from two other sources, there was evidence that to continue his PERS payments he had to regularly demonstrate that he continued to be disabled and that if he again became employable his PERS payments would cease. Furthermore, Shelane herself stated in her own "proposed settlement award" that Lawrence's "disability retirement becomes regular PERS retirement" when he turns 55.[10] CP (Oct. 19, 2019) at 95, 98. Accordingly, the trial court did not err by characterizing Lawrence's PERS disability income as his separate property.

---

[10] Shelane asserts that Lawrence's PERS tax forms establish that the Oregon PERS benefits were "from retirement/pensions/annuities and not disability pay." Br. of Appellant (No. 53639-1-II) at 14. This argument is not persuasive. Lawrence's 1099-R forms from the Oregon PERS state that the PERS payments were "[d]istributions from [p]ensions, [a]nnuities, [r]etirement or [p]rofit-[s]haring [p]lans, IRAs, [i]nsurance [c]ontracts, etc." Ex. 12. Although this shows that the payments were distributions from a PERS fund, the reference to "etc." shows that this list is not a finite list. Accordingly the 1099-R forms do not conclusively establish that the funds Lawrence was receiving were retirement funds rather than disability funds.

II. ASSETS TAKEN PRIOR TO THIS DISSOLUTION ACTION BEING FILED

Shelane next argues that the trial court erred "by not protecting her community property interest in" numerous assets that she asserted Lawrence took possession of prior to filing this dissolution action, including various bank and investment accounts, gold, and silver. Br. of Appellant (No. 53639-1-II) at 20. This arguments fails.

> In evaluating the parties' property in a dissolution proceeding, "the trial court may properly consider a spouse's waste or concealment of assets." *In re Marriage of Wallace*, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002), . . . . But it is well settled that, "[w]hen exercising this broad discretion, a trial court focuses on the assets then before it—i.e., on the parties' assets at the time of trial. If one or both parties disposed of an asset before trial, the court simply has no ability to distribute that asset at trial." *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001) (footnote omitted).

*In re Marriage of Kaseburg*, 126 Wn. App. 546, 556, 108 P.3d 1278 (2005). Consideration of each party's responsibility for creating or dissipating marital assets is relevant to the just and equitable distribution of property. *In re Marriage of Steadman*, 63 Wn. App. 523, 527, 821 P.2d 59 (1991); *In re Marriage of Clark*, 13 Wn. App. 805, 808-09, 538 P.2d 145 (1975).

Although Lawrence admitted that he liquidated some community assets in 2012,[11] and that he sold some additional silver in 2013 in order to buy the Plymouth 'Cuda,[12] there is nothing in the record before us establishing that these assets were available to distribute at the time of trial. Thus, the trial court did not err in failing to distribute these assets.

---

[11] Lawrence testified that Shelane took the couple's silver and gold in 2012, when she temporarily left the residence with their children. He admitted that he then cashed out some of the couple's other assets. But he testified that he was trying to keep Shelane from taking them, like she did the silver and gold, and that he did not intend to keep these assets from her or hide them.

[12] Tr. (May 24, 2019) at 72.

And to the extent Shelane is arguing that the trial court should have considered the waste or concealment of these assets when distributing the parties' other assets, the partial record supplied by Shelane omits significant portions of her testimony as Lawrence's witness and Lawrence's rebuttal testimony, and is therefore inadequate to allow us to review this issue in as far as it relates to the assets that were disposed of in 2012.[13] RAP 9.2(b) (party seeking review must provide an appellate record that contains all of the evidence necessary and relevant to the issues to be reviewed); *Bulzomi v. Dep't of Labor & Indus.*, 72 Wn. App. 522, 525, 864 P.2d 996 (1994) (an "insufficient record on appeal precludes review of the alleged errors.").

### III. EXCLUSION OF EVIDENCE RELATED TO MISSING ASSETS

Shelane also argues that the trial court restricted her ability to question Lawrence about "where these assets went" and that the trial court did not believe that evidence related to these assets was relevant. Br. of Appellant (No. 53639-1-II) at 32. Shelane does not establish that she is entitled to relief on these grounds.

The record shows that the trial court merely attempted to expedite the process of admitting the exhibits Shelane asserted were relevant to demonstrating that Lawrence had liquidated some community assets before this current dissolution proceeding. Merely expediting the admission of exhibits does not show that the trial court attempted to prevent Shelane from admitting any relevant evidence.

And to the extent Shelane is also arguing that the trial court prevented her from questioning Lawrence about these assets, she fails to direct us to any portion of the record to support this

---

[13] To the extent Shelane is also arguing that the trial court misapplied the burden of proof as to "where these assets went," we cannot address that argument given the missing portions of the record. Br. of Appellant (No. 53639-1-II) at 32.

argument. We hold pro se litigants to the same standard as attorneys, requiring compliance with all procedural rules. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). RAP 10.3(a)(6) requires the appellant to cite to the "relevant parts of the record." Because Shelane fails to direct us to the relevant part of the record, we decline to consider this argument.

IV. RIVER GLEN ROAD PROPERTY

Shelane further argues that the trial court erred "by not protecting her community property interest in the [River Glen Road property]," and by not concluding that Lawrence had acted in bad faith when he gave the land to his father. Br. of Appellant (No. 53639-1-II) at 23. Shelane does not establish that she is entitled to relief on these grounds.

First, the lot was sold prior to the trial, so it was not before the court for distribution. Second, the record before us establishes that there was no equity in the lot as it was purchased for at least $200,000 and sold for $179,000. Because there was no equity in the lot, there was no community asset to distribute.

And to the extent Shelane is arguing that the trial court should have considered Lawrence's transfer of this property to his father as waste or concealment of this asset when distributing the parties' other assets, the partial record supplied by Shelane omits significant portions of her testimony and Lawrence's testimony and is therefore inadequate to allow us to review this issue. RAP 9.2(b); *Bulzomi*, 72 Wn. App. at 525.

V. VEHICLES

Shelane next argues that trial court erred when it awarded the Mazda to her and the collectable Plymouth 'Cuda to Lawrence and when it failed to "disperse all of the remaining marital vehicles." Br. of Appellant (No. 53639-1-II) at 29. She contends that the division of the

Mazda and the Plymouth and the other vehicles "was not indicative of a just and fair division." *Id.* She also argues that the trial court erred in denying her motion for reconsideration on this issue.

The trial court's July 9, 2019 order stated, in part, "With regard to the remaining property assets, *each party is to retain the property they currently possess as their own* -- free from any claim from the other party. Specifically, [Lawrence] shall retain the Cuda automobile, and [Shelane] shall keep the Mazda 3 vehicle she currently possesses." CP (Oct. 1, 2019) at 134. Although the trial court did not specifically describe the other vehicles, it clearly states that each party was to retain ownership of the vehicles currently in their possession. Accordingly, the trial court did not err by failing to distribute all of the vehicles.

As to whether the division of the vehicles was just and equitable, it is true that the Mazda awarded to Shelane had significantly less value than the combined value of the Plymouth 'Cuda and the other vehicles awarded to Lawrence. But when determining whether a property division is just and equitable, we cannot view the value of one classification of assets in isolation. *See In re Marriage of Larson and Calhoun*, 178 Wn. App. 133, 137, 313 P.3d 1228 (2013) (in a dissolution proceeding all property is before the court). Accordingly, this argument fails.

VI. CHANGE OF SURVIVOR BENEFICIARY

Shelane further argues that the trial court erred "by not finding [Lawrence] had acted in bad faith by removing her as the survivor beneficiary of the Oregon PERS retirement pension." Br. of Appellant (No. 53639-1-II) at 32-33. She contends that the trial court erred by not requiring Lawrence to prove that the removal was in good faith. Because significant portions of Shelane's and Lawrence's testimony are not included in the record before us, we are unable to review this issue. RAP 9.2(b); *Bulzomi*, 72 Wn. App. at 525.

20

VII. VIOLATION OF TEMPORARY HEALTH INSURANCE ORDERS

Shelane argues that the trial court erred when it refused to rule on Lawrence's violation of the temporary orders regarding the family health insurance and failed to order Lawrence to pay her additional health care costs. Shelane further argues that the trial court erred by denying her motion for reconsideration on this same ground. Again, because significant portions of Shelane's and Lawrence's testimony are not included in the record before us, we are unable to review this issue. RAP 9.2(b); *Bulzomi*, 72 Wn. App. at 525.

VIII. SPOUSAL MAINTENANCE

Shelane next argues that the spousal maintenance was not just and equitable and that the trial court did not "fairly consider[ her] age, medical condition, disabilities, lack of skills, work history, financial obligations." Br. of Appellant (No. 53639-1-II) at 39. She asserts that the spousal support award was an abuse of discretion "in relation to the values in the assets it awarded to [Lawrence]."[14] *Id.*

We review a trial court's decision in a dissolution action for manifest abuse of discretion. *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985) (citations omitted). We will affirm the trial court's decision, "unless no reasonable judge would have reached the same conclusion." *Id.* at 809-10.

---

[14] Shelane also appears to assert that the trial court "placed itself in an ally position with [Lawrence]," and accepted everything he said as true. Br. of Appellant (No. 53639-1-II) at 39. She further alleges that the trial court placed her in a position wherein she had to represent herself and then used her ability to do so against her when evaluating her claim that she was disabled, but then failed to question Lawrence's disability in light of evidence that may have brought that disability into question. While we are troubled that Shelane's self-representation, which was likely forced as a result of her financial inability to hire counsel, was effectively used by Lawrence as evidence against her, these arguments address the trial court's weight and credibility determinations, which we do not review on appeal. *In re Estate of Palmer*, 145 Wn. App. 249, 266, 187 P.3d 758 (2008).

When deciding whether to award maintenance, the trial court must consider factors that "include the financial resources of each party; the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; the standard of living during the marriage; the duration of the marriage; and the time needed by the spouse seeking maintenance to acquire education necessary to obtain employment." *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994); RCW 26.09.090. The only limitation placed on a court's ability to award maintenance is that the amount and duration must be just in light of the relevant factors. *Washburn*, 101 Wn.2d at 178. Maintenance is "not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *Id.* at 179.

Shelane contends that the trial court did not "fairly consider[ her] age, medical condition, disabilities, lack of skills, work history, financial obligations." Br. of Appellant (No. 53639-1-II) at 39. But the record shows that the trial court fully considered each of these factors. The record also shows that the trial court considered the parties' "relative financial positions," noting the vast disparity in the parties' incomes.[15] CP (Oct. 1, 2019) at 132. Thus, the only remaining question is whether the trial court's decision was just in light of these factors. *Washburn*, 101 Wn.2d at 178.

The trial court awarded Shelane $1,500 a month in maintenance for three years. The court stated,

> This award takes into account [its] findings that there will be a disparity in the
> relative financial positions of the parties post-dissolution without this order of
> maintenance and that [Shelane] presented sufficient evidence to show that she will

---

[15] Although the trial court could not divide Lawrence's social security and veteran's benefits as community assets, it could consider the income from those sources when determining the amount of maintenance. *See In re Marriage of Weiser*, 14 Wn. App. 2d 884, 901-02, 475 P.3d 237 (2020) (quoting *Perkins v. Perkins*, 107 Wn. App. 313, 327, 26 P.3d 989 (2001)).

> have a difficult time obtaining gainful employment given her lack of experience and medical problems.

CP (Oct. 1, 2019) at 132.

But even with the $1,500 maintenance award,[16] Shelane's financial resources and income pale in comparison to Lawrence's resources, which amount to over $12,000 a month. Importantly, Shelane was not awarded any assets that she would be able to access before Lawrence turned 55 apart from an aging, high-mileage vehicle. And the trial court found that Shelane's lack of a recent job history made it unlikely that she would get a job with a salary approaching Lawrence's monthly income. Although we are generally hesitant to find an abuse of discretion when examining spousal maintenance, "where, as here, the disparity in earning power and potential is great, [we] must closely examine the maintenance award to see whether it is equitable in light of the post-dissolution economic situations of the parties" *In re Marriage of Sheffer*, 60 Wn. App. 51, 56, 802 P.2d 817 (1990). In this instance, the disparity in income, despite Lawrence's ability to pay, is significant enough to allow us to find that the trial court abused its discretion in awarding only $1,500 a month in maintenance for three years despite Shelane's lack of access to any other assets until Lawrence turns 55. Accordingly, we remand this matter for revision of the maintenance awarded by the trial court.[17]

---

[16] We note that this is half the amount of the temporary support that the trial court originally granted.

[17] Although "we do not mandate a maintenance award of a specific amount or duration[,] [w]e commend to the trial court's just discretion . . . consideration of an award tailored to the commencement of receipt of retirement benefits." *Sheffer*, 60 Wn. App. at 58 n.2 (citing *In re Marriage of Bulicek*, 59 Wn. App. 630, 633-36, 800 P.2d 394 (1990)).

## IX. UNPAID CHILD SUPPORT

Shelane argues that the trial court erred when it failed to resolve unpaid child support issues in the final orders. She also argues that the trial court erred when it failed to resolve this issue when it denied her motion for reconsideration. Once again, because significant portions of Shelane's and Lawrence's testimony are not included in the record before us, we are unable to review this issue. RAP 9.2(b); *Bulzomi*, 72 Wn. App. at 525.

## X. TEMPORARY CHILD SUPPORT ORDERS

Shelane further argues that the trial court erred when it set the child support in the temporary orders lower than the amount in the economic table and child support worksheets. But Shelane has not provided us with the record from the proceedings that resulted in the temporary orders, so we cannot address this issue. RAP 9.2(b); *Bulzomi*, 72 Wn. App. at 525.

## XI. RESTRICTING ACCESS TO PERS IAP ACCOUNT

Shelane next argues that the trial court erred by restricting her access to her portion of the PERS IAP account until Lawrence turns 55 years old and limiting her access to the account records. She asserts that there was no evidence that supports this restriction and that this restriction violates ORS 238A.375 because Lawrence had access to the account's funds when he "retired" in February 2012. Br. of Appellant (No. 54702-3-II) at 12. Shelane further argues that the trial court erred in denying motion for reconsideration on this matter.

There is no evidence in the record before us suggesting that the trial court has limited Shelane's access to the IAP account records. Accordingly, we do not further address Shelane's claim that the trial court has limited her access to account records.

And Shelane does not direct us to any evidence in the record regarding when the IAP account is available to Lawrence. Nor can we locate any evidence in the record supporting her assertion that the funds are available to Lawrence before he turns 55 years old. Although there is a possibility that Lawrence could have access to the IAP funds under ORS 238A.375 if he is an "inactive member," the record before us is devoid of any evidence regarding whether Lawrence is in fact an "inactive member" with respect to his PERS benefits. Accordingly, Shelane has not shown that the trial court erred when it restricted access to the IAP account until Lawrence turns 55.

Shelane also asserts that since the trial court denied her motion for reconsideration, she has obtained a letter from PERS stating that she could access the IAP account at any time, regardless of Lawrence's age. In the appendix to her brief, she attaches a copy of an email from PERS dated Monday, August 17, 2020, almost three months after the trial court entered its orders on Shelane's motion for reconsideration. Although this email states that once PERS determined that there was an award to her from Lawrence's IAP account, Shelane "may access those funds at any time by applying for them," the letter is not part of the record, so we cannot consider it. Br. of Appellant (No. 54702-3-II), app.

## XII. ASSIGNMENT OF DEBT

Shelane next argues that the trial court erred "by assigning unsubstantiated and unsupported debts towards [her] within the final orders." *Id.* at 4. She further argues that the trial court erred in denying motion for reconsideration on this issue.

To the extent Shelane is challenging the trial court's statement in Exhibit W that awards her community property "subject to any loans, liens, mortgages, or encumbrances," CP (Aug. 14,

2020) at 77, the record before us does not show that any of the property awarded to Shelane was subject to any loans, liens, mortgages, or encumbrances. Thus, based on this record, the trial court did not assign any "debts" to Shelane, and this argument has no merit.

To the extent Shelane is arguing that the trial court failed to adequately address the following liabilities: (1) "[t]he attorney's fees accumulated by [Lawrence] and his father regarding the fraudulent transfer act of the land on River Glen Rd.," (2) "[t]he real estate taxes paid on the land located on River Glen Rd[.] . . . ," and (3) "[t]he debt for Bank of America that was placed upon the land on River Glen R[d.]," that argument has no merit. *Id.* at 108. The trial court's order expressly assigned those debts and liabilities to Lawrence.

### XIII. REFERENCE TO OPIATE USE

Finally, Shelane argues that the trial court erred when it referred in the April 15, 2020 order on Lawrence's clarification motion to Lawrence's allegations that she was an opiate user. She contends that the reference to Lawrence's allegations was not supported by any evidence in the trial record and that including this language in the order "slanders [her]." Br. of Appellant (No. 54702-3-II) at 5. Shelane also argues that the trial court erred by denying her motion for reconsideration of this issue.

The part of the April 15, 2000 order that Shelane challenges references Lawrence's apparent assertions that Shelane had a history of opiate abuse:

> The court has previously considered all evidence presented at trial and considered [Lawrence's] arguments regarding [Shelane's] employability and [Lawrence's] allegations of multi-decade opiate use in making its written decision. No clarification is necessary on this issue as the prior written decision is not lacking in specificity or clarity.

CP (Aug. 14, 2020) at 69.

26

In his motion for clarification, Lawrence argued that the trial court had failed to consider his argument that Shelane was a long-term opiate user and that the court needed to consider this when determining Shelane's employability. The trial court's April 15, 2020 order merely stated that the court had considered the evidence presented and Lawrence's allegations and that the prior order did not require clarification regarding these allegations. The trial court's order addressed whether the trial court had considered Lawrence's argument, it did not need to be supported by evidence. And in merely confirming that it had considered Lawrence's argument, it did not slander Shelane. Accordingly, this argument fails.

## XIV. COSTS

Shelane requests "an award in the associated costs to bring this appeal." Br. of Appellant (No. 53639-1-II) at 47. Because Shelane has not filed and served the required affidavit of financial need within 10 days of the hearing date for this appeal, we decline to consider her request for costs. RAP 18.1(c).

## CONCLUSION

We hold that the trial court abused its discretion when it set Shelane's spousal maintenance at $1,500 a month for three years. Accordingly, we remand this matter for the trial court to determine the spousal maintenance.[18] We otherwise affirm. We deny Shelane's request for costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[18] Shelane requests that we resolve this case without remanding for additional proceedings. But because the trial court must exercise its discretion in determining the proper amount of spousal support, remand is required.

27

Consolidated Nos. 53639-1-II / 54702-3-II

CRUSER, J.

We concur:

GLASGOW, A.C.J.

VELJACIC, J.