# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>KELLY SKIDMORE,<br><br>Appellant,<br><br>And<br><br>IAN SKIDMORE,<br><br>Respondent. | No. 55478-0-II<br><br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — This appeal arises from a marriage dissolution action between Kelly J. Skidmore and Ian K. Skidmore.[1] Kelly appeals the trial court's orders addressing the distribution of property, spousal maintenance payments, and attorney fees. Kelly argues that the trial court abused its discretion in limiting spousal maintenance payments to 54 months rather than setting it at 15 years. Kelly also argues that the trial court abused its discretion in distributing property because it failed to enforce the equal division of a certain joint checking account pursuant to a pretrial order. Kelly further argues that the trial court abused its discretion in limiting her attorney fees award to half of her remaining unpaid fees and in declining to account for an attorney fees award pursuant to a pretrial order. Both Kelly and Ian request attorney fees and costs on appeal.

We hold that the trial court did not abuse its discretion in: limiting spousal maintenance payments, declining to award Kelly additional funds from the joint checking account at issue in its property distribution award, and limiting Kelly's attorney fees award to half her remaining unpaid

---

[1] This opinion utilizes the parties' first names for clarity. No disrespect is intended.

fees. We decline to address Kelly's argument pertaining to the trial court's refusal to account for an attorney fees award pursuant to a pretrial order. We deny Ian's requests for attorney fees on appeal, but grant Kelly's request. Accordingly, we affirm the trial court's orders addressing the distribution of property, spousal maintenance payments, and attorney fees.

FACTS

I.    FACTUAL BACKGROUND

Kelly and Ian were married on October 22, 1994 in Las Vegas, Nevada. Both are college educated individuals having earned their respective degrees in 1992. Kelly has Bachelor's degree in kinesiology[2] and adaptive physical education. Ian has a Bachelor's degree in business administration.

Shortly after college, Kelly moved to Kentucky where Ian worked as a tennis instructor at a country club. At the time, Kelly taught a few yoga classes, but Ian financially supported both of them. Not long thereafter, Kelly became pregnant with their first child. They ended up having two children during their marriage.[3] With children entering the fold, Kelly and Ian agreed that Kelly would stay home to raise their children while Ian worked full time.

In 1994, Kelly and Ian moved to California for Ian's work. In 1995, Ian accepted a position with Dana Corporation as a regional sales manager. Ian currently works for the same company as a national account manager, though the company has changed ownership since he first began.

---

[2] Kinesiology is the scientific study of human body movement. It addresses physiological, anatomical, biomechanical, pathological, neuropsychological principles and mechanisms of movement.

[3] Both of Kelly and Ian's children are adults and non-dependent.

For the next few years, Kelly raised their children at home and taught several different fitness classes when she could secure childcare. Kelly was either paid the minimum wage at the time or taught the classes on a volunteer basis.

In 2000 or 2001, Kelly and Ian moved to Flagstaff, Arizona for their children's sake. Kelly's health began to deteriorate shortly thereafter, which impacted her ability to work. Kelly was diagnosed with delayed phase sleep disorder, fibromyalgia, Raynaud's syndrome, a heart condition, and exhibited some symptoms akin to multiple sclerosis. MRIs also showed that Kelly had two or three lesions on her brain.

In 2006 or 2007, Kelly and Ian moved to Gig Harbor in hopes that it would improve Kelly's health. Eventually, Kelly was able to work again teaching yoga and Pilates about twice a week. Kelly has not gone back to a doctor for any additional diagnoses since moving to Washington.

In 2010, Kelly started a business called Firefly Energy Center, which offered yoga classes and massages. She also sold merchandise through the business. As the business started out, Kelly was able to teach one or two classes a day, six days a week. Kelly also ran the business full-time and often brought work home with her. However, one day at the studio, Kelly suffered from what she believed to be a Transient Ischemic Attack (TIA),[4] though she was never formally diagnosed with it. As a result, Kelly began to cut down on teaching.

In December 2017, Kelly closed Firefly Energy Center due to increasing rent. In the next two years, Kelly was involved in three different car accidents. As a result of these accidents, Kelly began to experience constant pain in her back and right hip, and had increased issues with her

---

[4] A TIA is a temporary period of symptoms similar to those of a stroke. It causes paralysis in face, arm or leg usually on one side of the body, slurred speech, double vision or blindness, and loss of balance or coordination.

balance. She also suffers from pain in her back and shoulders on a daily basis. She was diagnosed with Post Traumatic Stress Disorder (PTSD).

In July 2019, Kelly and Ian sold their Gig Harbor house and equally split the net proceeds. On July 31, after 24 years of marriage, Kelly and Ian separated. Kelly moved to Montana, where she currently resides.

Both Kelly and Ian are 51 years old. Kelly's physical and mental health history increases her monthly health expenses. In fact, Kelly has "some big bills coming up that will wipe out [her and Ian's] Health Savings Account." Report of Proceedings (RP) at 184. On the other hand, Ian is in good health and does not have any major issues.

Kelly has not earned an income since 2017. She reported income for 10 years during the marriage, but has not yet earned the requisite credits to qualify for social security at retirement. On the other hand, Ian has enjoyed a steadily increasing income since he and Kelly married in 1994. In fact, Ian has earned well over $100,000 per year since 2011, has a well-funded 401(k), and qualifies for social security benefits at retirement.

II.    PROCEDURAL HISTORY

A.    Petition and Pretrial Proceedings

On August 29, 2019, Kelly filed a petition for legal separation in Pierce County superior court. The petition was later amended by agreement to a petition for dissolution. Kelly requested an equitable division of property and debts (60/40 in her favor), long term spousal maintenance (15 years), and attorney fees and costs.

On November 6, Kelly and Ian entered into an agreed temporary family law order. Pursuant to this agreed order, Ian was required to: pay Kelly spousal support in the amount of 50 percent of his net income each month effective November 1; pay for half of the auto loan and

insurance on the Chevrolet Colorado, which Kelly possessed and used; and pay for both parties' medical and life insurance. This agreed order further required both Kelly and Ian to be responsible for their own debts moving forward, including debt from credit cards, loans, security interests, and mortgages.

On March 11, 2020, Ian filed a motion requesting to modify the November 6 temporary order. More specifically, Ian requested to reduce spousal maintenance payments to $1,200 per month and require each party to pay for their own car and car insurance because Kelly could return to work and contribute to her own financial support.

On March 16, Kelly filed a motion requesting the trial court to award her $20,000 in attorney fees and costs.

On April 3, the trial court denied Ian's motion to modify. The court also found that Ian had received an annual bonus of $32,707. The court then entered an order requiring Ian's annual bonus be equally split by the parties and permitted Kelly's half to be applied towards her attorney fees.

B.      The Trial

On September 17, this dissolution action proceeded to a two-day bench trial. The trial court heard testimony from three witnesses: Kelly, Ian, and Debra Kolander, Kelly's counselor.

Kelly testified that she wanted to pursue an education in order to support herself after failing to secure employment in Montana. In fact, Kelly testified that she had already been accepted to two different education programs.

One program is a master of science in clinical mental health counseling at Grand Canyon University, which would supplement her Bachelor's degree. Kelly testified that this is a four-year online program. She believed she could earn $35,000 to $50,000 a year as a clinical counselor.

Kelly also testified that, despite her physical health challenges, she would be able to hold a job as a counselor.

The other program is a certification in biophysics. Kelly testified that this program would be approximately two years with both online and in-person instruction. This program would also require Kelly to fly to four or five different locations for hands on work. Kelly testified that she believed she could earn $20,000 to $30,000 after completing the biophysics program and certification.

Kelly testified that she would find it easier to work as a clinical counselor. However, Kelly stated that her choice between the two programs depended on the amount of maintenance the trial court awarded her.

Kolander has maintained a professional relationship with Kelly since 2009 or 2010 by providing her counseling therapy and quantum biofeedback sessions. Kolander testified that Kelly would excel going back to school on a full-time basis. Kolander also testified that Kelly would be able to work on a full-time basis without interruption after receiving her degree because "[t]here's nothing strenuous involved." RP at 299.

Kelly also provided testimony about certain October expenses that she alleged Ian failed to pay her pursuant to the November 6 order. Ian testified that it was his understanding that "[he] agreed to pay the credit card bills off by October 31[, 2019]." RP at 253. Kelly agreed and testified that it was her understanding that no further expenses would be paid from the Charles Schwab joint checking account after November 1, 2019:

> Q. Was it your understanding that after November 1st, that was the cutoff that there wasn't going to be any more money taken out of the accounts?
> A. Yes.

RP at 149. Kelly further testified that, although the October expenses she sought to be reimbursed for were billed on November 6 (after the agreed cut-off date), Ian should have shared in the expenses before equally dividing their Charles Schwab joint checking account.

C.     Final Orders

On October 14, 2020, the court entered its findings and conclusions and dissolution decree. The court awarded 55 percent of the marital assets to Kelly and 45 percent of the martial assets to Ian. The court awarded Kelly an additional $35,000 from the net sale proceeds she received from the Gig Harbor house ($218,337.86). The court also awarded Kelly $280,311.65 (or 55 percent) of Ian's 401(k) account. The court denied Kelly's request to be awarded an additional $1,659.51 from the Charles Schwab joint checking account.

The court denied Kelly's request for long term spousal maintenance payments. More specifically, the court found that "there was a lack of evidence utilizing the factors under [RCW] 26.09.090 that [Kelly] would require 15 years of spousal maintenance in order to put her in [a position to support herself]." RP at 326. Instead, the court awarded spousal maintenance to Kelly for a total of 54 months in the amount of $3,000 per month. In addition, Kelly would receive 25 percent of the net bonuses that Ian receives until spousal maintenance terminates. The court in awarding spousal maintenance also took into account the fact that Ian had already been paying Kelly 50 percent of his net income and all of the bills pursuant to the November 6 order discussed above.

The court awarded attorney fees and costs to Kelly in the amount of $4,500, which covers roughly half of her unpaid fees. The court reasoned that both Kelly and Ian had the ability to pay and that Kelly had some need. From these orders, Kelly appeals.

ANALYSIS[5]

I.    MAINTENANCE AWARD

Kelly argues that the trial court abused its discretion in limiting maintenance payments to $3,000 per month for a period of 54 months along with 25 percent of Ian's net bonuses. Given the trial court's broad discretion in determining spousal maintenance awards, we disagree.

A.    Legal Principles

We review an award of maintenance for abuse of discretion. *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 563, 446 P.3d 635 (2019). The trial court has broad discretion to award maintenance. *Id.* "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Id.*

A purpose of maintenance is to support a spouse until they are able to become self-supporting. *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). "Maintenance is 'a flexible tool' for equalizing the parties' standards of living for an 'appropriate period of time.'" *In re Marriage of Wright*, 179 Wn. App. 257, 269, 319 P.3d 45 (2013) (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984)). "[T]he reasons for this policy include the valid goals of disentangling the divorcing spouses and setting each on a road to self-sufficiency." *In re Marriage of Bulicek*, 59 Wn. App. 630, 634, 800 P.2d 394 (1990). Ultimately, the court's main concern must be the parties' economic situations post dissolution. *Washburn*, 101 Wn.2d at 181.

---

[5] Kelly assigns error to multiple findings of fact but fails to argue how any of them were not supported by substantial evidence in the record. Failure to present any argument constitutes a waiver of an assignment of error. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we do not address Kelly's various assignments of error challenging the trial court's findings of fact.

RCW 26.09.090(1) provides a nonexclusive list of factors that the trial court must consider

on the issue of maintenance:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . .;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

Although the trial court must consider the factors listed in RCW 26.09.090(1), it does not

need to make specific factual findings on all of the factors. *Anthony*, 9 Wn. App. 2d at 564.

Maintenance not based on a fair consideration of the statutory factors constitutes an abuse of

discretion. *Id*. "'The only limitation on amount and duration of maintenance under RCW

26.09.090 is that, in light of the relevant factors, the award must be just.'" *Id.* (quoting *Bulicek*,

59 Wn. App. at 633).

B.      The Trial Court did Not Abuse its Discretion in Setting the Maintenance Award

Kelly argues that the trial court abused its discretion in setting the maintenance award

because it only considered the amount of time necessary for her to obtain an education and enter

the workforce. We disagree.

Here, although the trial court did not make specific factual findings, the record shows that

the court considered all of the factors in RCW 26.09.090(1) when it set Kelly's maintenance award.

In setting the award, the trial court took into account that it had awarded Kelly 55 percent of the

available marital assets in its property distribution order, which was valued at over $500,000 in total. The court also considered the time necessary for Kelly to acquire her Master's degree in clinical mental health counseling (the longer four year program) and time to secure necessary employment thereafter. Although the maintenance award would terminate shortly after her expected graduation date (in four and a half years), the court also considered the fact that Ian had been already been paying Kelly half of his income and all of their bills pursuant to the November 6 temporary order, which amounted to spousal maintenance payments. The court also recognized the length of the marriage, standard of living the couple enjoyed, and the ability of Ian to meet his own obligations in setting the maintenance award. This is supported by the larger proportion of martial assets awarded in Kelly's favor and the fact that she would be receiving $3,000 per month tax free for 54 months whereas Ian's monthly income would be a taxable event. The court further recognized Kelly's age and health in setting the award noting that there was insufficient evidence that "she is prevented in any way based on her current physical health from working full time at a job." RP at 327.

Because the record shows that the trial court considered all of the factors under RCW 26.09.090(1), and because the trial court has broad discretion in fashioning spousal maintenance awards, we hold that the trial court did not abuse its discretion in its award of maintenance.

Kelly contends that the trial court abused its discretion in limiting the maintenance award to 54 months. She argues that the trial court's theory that maintenance is rehabilitative in nature has been rejected by Washington courts. Kelly relies on *Bulicek*, 59 Wn. App. 630, to support her argument that the trial court should have awarded maintenance for 15 years based on the disparate earning power between her and Ian. We disagree.

10

In *Bulicek*, Division One of this court held that the trial court did not abuse its discretion in ordering the husband to pay maintenance to his wife until he retires. 59 Wn. App. at 635-36. There, the husband argued that maintenance should be rehabilitative in nature and transitional in duration, and should last only 1 or 2 years to allow the wife time to secure further job training. *Id*. at 633. The court rejected the husband's argument because "*[t]he record indicate[d]* that rehabilitation is not an issue here." *Id*. (emphasis added). Rather, the court explained that trial courts are given wide discretion to fashion a dissolution order that will address the circumstances of the parties and the record in that case demonstrated that, "after a long-term marriage, [the wife] is in ill health and has limited job skills and experience." *Id*. at 634. Thus, the trial court in that case correctly recognized that the wife would be in need of more than temporary support. *Id*. at 635.

Here, Kelly's reliance on *Bulicek* is unavailing. Unlike *Bulicek*, the record here demonstrates that Kelly *does* have the ability to become self-supporting. While Kelly does have health ailments, nothing in the record shows that her health prevents her from working a full-time job (especially in her desired career path) or will lack the necessary job skills upon completing her education that would justify a long-term maintenance award like the wife in *Bulicek*. Because the purpose of maintenance is to support a spouse until they are able to become self-supporting, and because the circumstances of this case differ from *Bulicek*, we conclude that the trial court did not abuse its discretion in limiting the duration of maintenance to 54 months.

Kelly also contends that the trial court abused its discretion in limiting the maintenance award because it erroneously relied on *Berg v. Berg*, 72 Wn.2d 532, 434 P.2d 1 (1967), and *Hogberg v. Hogberg*, 64 Wn.2d 617, 393 P.2d 291 (1964), for the proposition that "'it is not the policy of the law of this state to give [one spouse] a perpetual lien on [the other spouse's] future

11

income.'" Br. of Appellant at 51 (quoting *Bulicek*, 59 Wn. App. at 634). Kelly appears to suggest that *Berg* and *Hogberg* are "outdated" in their approach to spousal maintenance and that we should decline to follow those cases. Br. of Appellant at 51. However, while the patriarchal language used by the court in those cases is indeed outdated, neither *Berg* nor *Hogberg* have been overruled by the Supreme Court. We are bound to follow Supreme Court precedent. *Peterson v. Dep't of Lab. & Indus.*, 17 Wn. App. 2d 208, 222, 485 P.3d 338 (2021). Accordingly, we reject Kelly's argument.

The trial court properly considered the statutory factors regarding maintenance and the facts in this particular case. Even so, in the end, this property and maintenance ruling appears inadequate to recognize the lifetime of sacrifice Kelly made. But we are constrained by the standard of review and facts of this particular case, including Kelly's own testimony; we cannot conclude that the maintenance award was an abuse of discretion.

## II.  CHARLES SCHWAB JOINT CHECKING ACCOUNT[6]

Kelly argues that the trial court abused its discretion in concluding that the Charles Schwab joint checking account was divided equally because Ian withheld $1,659.51 from her, which were expenses from October that should have been paid by Ian pursuant to the November 6 order. We disagree.

---

[6] In allocating property, the trial court must consider a list of nonexclusive factors set forth in RCW 26.09.080, including "(1) [t]he nature and extent of the community property; (2) [t]he nature and extent of the separate property; (3) [t]he duration of the marriage . . .; and (4) [t]he economic circumstances of each spouse . . . at the time the division of property is to become effective." *See In re Marriage of Zahm*, 138 Wn.2d 213, 218, 978 P.2d 498 (1999).

Here, Kelly does not allege that the trial court failed to consider the factors under RCW 26.09.080 in its property distribution award. Instead, she merely contends in conclusory fashion that the trial court abused its discretion in concluding that the Charles Schwab joint checking account was equally divided pursuant to the November 6 order. Accordingly, this opinion does not analyze the factors under RCW 26.09.080.

Trial courts are vested with "broad discretion" to determine a just and equitable allocation of property based on the particular circumstances in a case. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). Accordingly, "'[a] property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion.'" *In re Marriage of Urbana*, 147 Wn. App. 1, 9, 195 P.3d 959 (2008) (quoting *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005)). A trial court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *Id*. at 9-10.

In a marriage dissolution proceeding, a trial court is tasked with disposing of the parties' property and liabilities, "'either community or separate, as shall appear just and equitable after considering all relevant factors.'" *Muhammad*, 153 Wn.2d at 803 (quoting RCW 26.09.080). Mathematical precision is not required in a just and equitable distribution; instead, a trial court must ensure "'fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.'" *In re Marriage of Zahm*, 138 Wn.2d 213, 219, 978 P.2d 498 (1999) (quoting *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)).

Here, Kelly and Ian both agreed to pay off all expenses by October 31, 2019, after which the Charles Schwab joint checking account would be equally split and they would be responsible for their own debts moving forward. Kelly testified that the October expenses she seeks to be reimbursed from Ian ($1,659.51) from the Charles Schwab joint checking account were billed on November 6, which was well after the agreed cut-off date of November 1. Because the trial court has broad discretion to determine a just and equitable division of property, and because the record shows that the funds Kelly seeks to be reimbursed for were billed after the agreed cut-off date, we

13

hold that the trial court did not abuse its discretion in denying Kelly's request for an additional $1,659.51 to paid from the Charles Schwab joint checking account in its property distribution award.

III.     ATTORNEY FEES AT TRIAL

Kelly argues that the trial court abused its discretion by (1) granting her only $4,500 in attorney fees and (2) declining to account for attorney fees pursuant to the April 3 order. We disagree with the first argument and decline to address the second argument.

A.     Legal Principles

We review a trial court's ruling regarding attorney fees under RCW 26.09.140 for an abuse of discretion. *In re Marriage of Nelson*, 62 Wn. App. 515, 521, 814 P.2d 1208 (1991). The party challenging the award bears the burden of proving the court's decision was clearly untenable or manifestly unreasonable. *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994).

RCW 26.09.140 provides that a trial court may order one party to pay reasonable attorney fees, costs, or other professional fees related to the dissolution litigation to the other party "after considering the financial resources of both parties." In considering the financial resources of both parties, the court must "'balance[] the needs of the spouse seeking fees against the ability of the other spouse to pay." *Urbana*, 147 Wn. App. at 16 (*quoting In re Marriage of Moody*, 137 Wn.2d 979, 994, 976 P.2d 1240 (1999)).

B.     The Trial Court did Not Abuse its Discretion in Limiting Kelly's Attorney Fees

Kelly argues that the trial court abused its discretion in limiting her attorney fees award to $4,500, which was approximately half of her remaining unpaid fees. We disagree.

Here, the trial court found that approximately $9,000 of Kelly's attorney fees remained unpaid. The court found that Kelly had some need and that Ian had some ability to pay. However,

the court limited Kelly's fee award to $4,500 (or 50 percent of her unpaid fees) because Kelly had liquid assets available from the property distribution award. Because the additional attorney fees that Kelly seeks to be awarded have already been paid, and because Kelly had liquid assets available from the property distribution award, it was not untenable or manifestly unreasonable for the trial court to conclude that Kelly only had a need insofar as the unpaid fees were concerned. Accordingly, given the trial court's discretionary authority under RCW 26.09.140, we hold that the trial court did not abuse its discretion in limiting Kelly's attorney fees award to $4,500.

Kelly, citing *Knight*, 75 Wn. App. at 730, argues that the trial court abused its discretion because "RCW 26.09.140 does not only look at unpaid fees" and that "case law rejects the notion as it is common for fee awards under RCW 26.09.140 to include an award of fees and costs already incurred." We disagree. While Kelly is correct that fee awards typically include fees and costs already incurred, nowhere in *Knight* did the court hold that a trial court abuses its discretion in considering unpaid attorney fees and available liquid assets to determine financial need. 75 Wn. App. at 728-31. Accordingly, Kelly's argument fails.

Kelly further contends that "RCW 26.09.140 does not require a financially disadvantaged spouse to forego an equitable division of assets and debts to qualify for an appropriate attorney fee award," without any citation to pertinent authority. Br. of Appellant at 53-54. Besides the fact that this argument presupposes that the court's refusal to award her the totality of her attorney fees defeats the equitable distribution of the estate, something we do not concede, it is well-established that "[a]ppellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010). Because Kelly fails to provide citation to authority to support her contention, we decline to address the argument.

C.     The April 3 Order

Kelly argues that the trial court erred in declining to account for the attorney fee award to her that Ian never paid. Kelly appears to be addressing the trial court's April 3 order discussed above in advancing this argument, but does so without any citation to authority.

As discussed above, "[a]ppellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook*, 158 Wn. App. at 794. Because Kelly fails to provide any citation to pertinent authority to support her argument that it was reversible error for the court to decline enforcing/allocating/accounting for attorney fees pursuant to the April 3 order, we need not consider the argument.

IV.     ATTORNEY FEES AND COSTS ON APPEAL

A.     RAP 18.1 and RCW 26.09.140

Both Kelly and Ian request attorney fees and costs on appeal pursuant to RAP 18.1 and RCW 26.09.140. We deny Ian's request, but grant Kelly's request.

RAP 18.1(a) provides that we may grant attorney fees "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court." As discussed above, RCW 26.09.140 provides that the court may order one party to pay reasonable attorney fees, costs, or other professional fees related to the dissolution litigation to the other party "after considering the financial resources of both parties." This statute also grants us the discretionary authority to award attorney fees and costs on appeal. RCW 26.09.140.

RAP 18.1(c) provides that,

> In any action where applicable law mandates consideration of the financial resources of one or more parties regarding an award of attorney fees and expenses, each party must serve upon the other and file a financial affidavit no later than 10 days prior to the date the case is set for oral argument or consideration on the merits.

16

"An appellate court will not consider an award of attorney fees on appeal under RAP 18.1 and RCW 26.09.140 when a party seeking fees fails to comply with RAP 18.1(c)." *In re Marriage of Crosetto*, 82 Wn. App. 545, 565-66, 918 P.2d 954 (1996).

Here, as of 10 days before this case was set for consideration on the merits, Ian failed to submit an affidavit of financial need as required by RAP 18.1(c). However, Kelly has. Kelly's financial affidavit shows that she has a need given her monthly income and expenses. And as discussed above, Ian has an ability to pay given his monthly income. Accordingly, we deny Ian's request for attorney fees and costs on appeal, but grant Kelly's request.

B.      RAP 18.9

Ian requests attorney fees and costs on appeal pursuant to RAP 18.9(a) because he contends that Kelly's appeal was meritless and therefore frivolous. We disagree.

Under RAP 18.9(a), we may order a party who uses the rules for the purpose of delay, files a frivolous appeal, or fails to comply with the rules to pay terms to any party who has been harmed by the delay or the failure to comply. "An appeal is frivolous when the appeal presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012).

Here, Kelly's arguments on appeal were not so lacking in merit that there is no possibility of reversal. Accordingly, we deny Ian's request for attorney fees and costs incurred on appeal under RAP 18.9(a).

CONCLUSION

We affirm the trial court's award of maintenance, division of property, and award of attorney fees. We deny Ian's request for attorney fees and costs on appeal, but grant Kelly's request.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

I concur:

Price, J.

CRUSER, A.C.J. (dissenting)—I respectfully dissent from the majority's opinion at Section I.B. of the Analysis, holding that the trial court did not abuse its discretion in setting the spousal maintenance award.

When setting an amount and length of time for maintenance, the trial court must consider the following factors:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . . ;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1)(a)-(f). These factors are not exclusive, and "the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984). Following the bench trial in this case, the trial court awarded spousal maintenance to Kelly in the amount of $3,000 per month for 54 months. The majority concludes that the trial court's maintenance award reflects a consideration of all of the factors under RCW 26.09.090(1).

Regarding Kelly's future job prospects, although Kelly did not express any concern about her physical ability to work, she also testified that, in her attempts to secure employment in Montana, she had been turned down for a job at a shop due to her age. Additionally, Kelly testified that both of the career paths she was exploring required significant additional education. One program that would enable Kelly to pursue a career in counseling is a master of science in clinical

mental health counseling at Grand Canyon University. Kelly testified that this is a *four-year* online program, which, as the majority concedes, would comprise most of the period of her spousal maintenance. Kelly's testimony at trial established that she could earn $35,000 to $50,000 per year as a clinical counselor. The other career path involved Kelly obtaining a certification in biophysics. Kelly testified this program would take approximately two years with both online and in-person instruction and would include travel obligations. Kelly testified that she believed she could earn $20,000 to $30,000 per year after completing the biophysics program and certification.

The trial court noted Kelly's lack of work history, her age, and her physical limitations when explaining its maintenance award. However, it does not appear that the trial court took these facts into account when considering the reality that Kelly could face substantial difficulty in actually securing future employment following completion of one of the programs she described. Rather, the trial court simply concluded that there was not sufficient evidence that Kelly was "prevented in any way based on her current physical health from working full time at a job." Verbatim Report of Proceedings (VRP) at 327. Given the potential issues she will face in obtaining employment following graduation, I would hold that the trial court's award did not reflect a consideration of the time necessary for Kelly to find employment under RCW 26.09.090(1)(b).

In addition, under RCW 26.09.090(1)(c) and (d), the standard of living established during the marriage and the duration of the marriage must be considered by the trial court. This requirement "mak[es] it clear that maintenance is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *Washburn*, 101 Wn.2d at 179. The record does not reflect that the trial court considered the fact that the parties agreed that Kelly would stay home and care for the couple's children so that Ian could "begin his career" and that, as a result of this arrangement and

Kelly's unpaid labor at home,[7] Ian has been able to earn over $100,000 per year since 2011. VRP at 33. Conversely, Kelly's testimony at trial established that she could earn $35,000 to $50,000 per year as a clinical counselor or $20,000 to $30,000 per year after obtaining a biophysics certification. Considering the standard of living established during the parties' 24-year marriage, as well as Kelly's age, her well-documented health issues, and her minimal work history, I would hold that the trial court abused its discretion in setting the maintenance award in this case.

For these reasons, I dissent from the majority's holding that the trial court did not abuse its discretion in setting the spousal maintenance award.

CRUSER, A.C.J.

---

[7] "There is no universally recognized term or definition for unpaid labor – also referred to as unpaid work, unpaid care work, domestic labor, or household labor – but it is considered broadly inclusive of all responsibilities and tasks done to maintain a household and its family members without any explicit monetary compensation."

*What is the true impact of unpaid labor on women?*, MEDICAL NEWS TODAY (Sept. 11, 2022), https://www.medicalnewstoday.com/articles/what-is-the-true-impact-of-unpaid-labor-on-women#What-constitutes-unpaid-labor?.